JESÚS LOZADA APONTE y OTROS, demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* R-83-429      *Resuelto:* 14 de marzo de 1985

---

(3) Como se recordará, la pena fija por el delito de robo monta a doce años de prisión.

*Miguel Pagán, Procurador General Interino, Lirio Bernal, Procuradora General Auxiliar,* abogados de El Pueblo, recurrente; *Pedro J. Córdova* de *Miranda Cárdenas, De Corral & Rodríguez Suris,* abogado del recurrente Dr. Jorge E. Corretjer Benvenutti; *Gilberto L. Irizarry González,* abogado de la recurrente Corporación Insular de Seguros; *Samuel Gracia Gracia,* abogado de la parte recurrida.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Al decidir este recurso recordamos que " '*el ejercicio de la cirugía demanda una incontestable solidez moral: no hay hombre que reciba más a menudo que el cirujano la impresión de más fuertes emociones, dulces a veces, generalmente trágicas y dolorosas pero de una variedad infinita. . . . El conoce la angustia del peligro inminente y la satisfacción de la dificultad vencida. No hay un solo acto de su vida profesional que no importe para el cirujano tremenda responsabilidad . . .'*.

"Y si esto es así, decimos nosotros, *si el riesgo es la sombra que siempre se proyecta sobre la mano que opera en defensa de la vida o de la salud ¿a qué crear ese mismo riesgo sirviendo a las exigencias de la puerilidad . . . ?*" (Énfasis en el original.) J. Silva De la Riestra, *Responsabilidad Médica ante la Ley,* IX Rev. C. Abo. La Plata 49, 65 (1967).

## I

Alberto Lozada Montañez desde los doce (12) años presentó en repetidas ocasiones una condición de hematuria leve —sangre en la orina— que él describía como "que orinaba color coca cola". Según su padre, Sr. Jesús Lozada Aponte, en ocasiones sentía dolor en el área de los riñones. Por esta razón el 4 de junio de 1976 —cumplía los diecisiete (17) años en el mes de septiembre— visitó al especialista en nefrología Dr. Jorge Corretjer Benvenutti. Su entonces novia, hoy esposa, Sra. Migdalia Martínez Piñero lo refirió y acompañó. Era la secretaria en el consultorio privado del doctor Corretjer. El galeno lo atendió. Comenzó el tratamiento privadamente, pero debido a que Alberto carecía de medios económicos para sufragar los exámenes recomendados, continuó viéndolo y brindándole atención y tratamiento por aproximadamente dos (2) años en el Departamento de Clínicas Externas (OPD) del Hospital Regional de Caguas. En dicho lugar este facultativo prestaba servicios para el Estado. Allí subsiguientemente se anotó en el historial clínico que la hematuria se presentaba cuando hacía ejercicios violentos.

A partir de junio de 1976, Alberto fue paciente del referido hospital. El doctor Corretjer ordenó varias pruebas y exámenes. El 25 de febrero de 1977 se le practicó un Pielograma Intravenoso (IVP), que consiste en una prueba radiográfica usada para caracterizar la morfología del riñón y su función. Se utiliza en el diagnóstico de hipertensión si hay masas, piedras, etc. Ésta reveló "blunting of the calyces with narrowing of the cortico medular ratio probably due to chronic pyelonephritic changes". Durante otra hospitalización se le practicaron "DTPA Renal Blood Flow, DTPA Renal Scan y Hyppuran Renogram". Estos estudios respectivamente revelaron "poor blood flow to the left kidney—normal right renal blood flow; abnormal scintegraphic findings confirmed the ones previously describe[d] in renogram study done on 4/19/77, which showed bilateral impairment on blood supply, function and excretory phase, all of them more prominent in the left kidney"; y "marked bilateral impairment of kidney function or blood supply but worst on the left kidney". Durante esa hospitalización también se dieron órdenes para hacerle un arteriograma en el Centro Médico de Río Piedras el 11 de julio de 1977. Alberto iría acompañado de su hermano Víctor Lozada. El referido arteriograma no se hizo, según el nefrólogo, porque el paciente no tenía interés, y según Alberto, porque había problemas con el equipo y no consiguió al médico referido en el Centro Médico de Río Piedras. El 15 de julio se le dio de alta.

El récord médico del Hospital Regional de Caguas demuestra presiones diastólicas normales, así como anormales (95 o más en un paciente de 16 años), también indica dicho récord que en la orina había en algunas ocasiones no más de dos células rojas por "high power field". Los estudios radioisotópicos hechos en 19 de abril y 5 de julio de 1977 demostraron problemas con la función renal (fase excretorial) en ambos riñones (disfunción), pero más marcada en el riñón izquierdo y flujo de sangre renal deficiente en ambos lados,

particularmente en el lado izquierdo. No obstante, el récord médico en dicho hospital refleja varios estudios de creatinina sérica, depuración de creatinina, de gravedad específica, que fueron normales. Así mismo hay pruebas de proteína de 24 horas que fueron normales y que demostraron integridad del tejido renal. Los estudios de albuminuria (*Bun*) fueron normales, no había sedimento activo, la proteinuria era mínima o simplemente no significativa; se hicieron varios urinálisis y no habían cilindros (*casts*) en la orina que deben verse cuando hay glomerulonefritis. Durante el mes de febrero de 1978 se le efectuó una cistoscopía que resultó normal.

Al persistir la hematuria leve y ante un cuadro recurrente, para abril de ese mismo año, el doctor Corretjer diagnosticó preliminarmente la posibilidad de una pielonefritis o glomerulonefritis.[1] Para corroborar esta impresión y establecer un diagnóstico etiológico decidió —previa explicación y consentimiento informado— realizar una biopsia renal del riñón izquierdo, que era el más afectado según los resultados. En lo pertinente se hizo constar que el procedimiento sería "sacar muestra de riñón con aguja para estudios posteriores", y además, que fueron explicados los siguientes riesgos: "sangramiento, perforación víscera, peritonitis, shock".

El 1ro de junio de 1978, bajo los efectos de anestesia local, se hizo la biopsia renal percutánea (a través de la piel), o

---

[1] "La pielonefritis es definida como cambios (patológicos y fisiológicos) que ocurren como consecuencia de infección en el riñón." B. M. Brenner y F. C. Rector, *The Kidney*, Filadelfia, W. B. Saunders Co., 1976, pág. 1080.

"Glomerulonefritis es un desorden en el riñón, en el cual el glomérulo es lesionado a través del mecanismo inmunológico. Se manifiesta, característicamente, por ciertos cambios prolíferos e inflamatorios de la estructura glomerular y una presentación clínica distintiva." (Traducción nuestra.) Abner-Golden y J. F. Maher, *The Kidney-Structure and Function in Disease*, Baltimore, The Williams and Wilkins Company, 1971, pág. 89.

A su vez el glomérulo es el "manojo de vasos capilares de los corpúsculos renales, alimentados por las ramas terminales de la arteria renal". *Diccionario de Ciencias Médicas Dorland*, 6ta ed., Argentina, Librería "El Ateneo", 1979, pág. 611.

biopsia de aguja, en el mencionado hospital regional. Una vez realizada Alberto fue trasladado a una habitación. Se esperaba una convalecencia temporera. Lamentablemente no fue así. Todo indica que "sufrió un trauma en el riñón izquierdo al practicársele la biopsia renal [y] ocurrió una lesión vascular". Comenzó a sufrir un profuso flujo de sangre por la uretra (hematuria severa). Su condición era tan delicada que fue necesario administrarle transfusiones para reponerle la pérdida masiva de sangre. Se le continuó dando un estrecho seguimiento, vigilando el pulso, respiración, presión sanguínea, orina y hematocrito, esperanzados el médico y demás personal que la hemorragia se detendría espontáneamente. No mejoró. Siguió deteriorándose. Fue indispensable trasladarlo a la Unidad de Cuidado Intensivo. Durante todo este período fue necesario administrarle 2.5 litros de transfusión de sangre.([2]) Así las cosas, al cabo de quince (15) días de la biopsia, y en vista de que no mejoraba, se decidió realizar una exploratoria del riñón afectado con el objetivo de localizar el área de sangría. El 15 de junio se llevó a cabo. No se encontró el lugar específico de la laceración. Se procedió entonces a una nefrectomía por el Dr. Agustín Medina Rosario. Al serle extirpado el riñón izquierdo reveló un hematoma perirenal severo e inmerso. Después de estas vicisitudes, Alberto se recuperó satisfactoriamente. Posteriormente contrajo matrimonio.

Ante el Tribunal Superior, Sala de Caguas, Alberto, su esposa, y sus padres demandaron al doctor Corretjer, su aseguradora la Corporación Insular de Seguros y el Estado Libre Asociado. Luego de un técnico y complejo proceso donde testificaron cuatro (4) peritos —en adición a otros médicos que intervinieron en el tratamiento y estudios— el tribunal en elaborado dictamen declaró con lugar la acción. En esencia,

---

([2]) El cuerpo humano contiene aproximadamente 5 litros de sangre. V. B. Montcastle, *Medical Phisiology*, 13ra ed., San Luis, The C. V. Mosby Co., 1974, Vol. 2, pág. 846.

dicho foro determinó que aun cuando existió consentimiento válido para los tratamientos habidos, se incurrió en mala práctica médica consistente en que la biopsia renal estaba contraindicada por haberse omitido un diagnóstico diferencial adecuado, y haberse efectuado en una facilidad clínica donde no existía un equipo de arteriografía.(3) Concluyó que un arteriograma pudo haber localizado el sitio preciso del sangramiento lo cual "hubiera dado la oportunidad de salvar el riñón en su totalidad o parcialmente siendo el mismo de utilidad además para dirigir al cirujano en el área de la sangría para ayudar a salvar el riñón". Concedió a Alberto $10,000 por los daños físicos y mentales sufridos y $80,000 por los permanentes consistentes en la pérdida del riñón. A su esposa la Sra. Migdalia Martínez Piñero la suma de $1,000 y a sus progenitores la Sra. Virginia Montañez y el Sr. Jesús Lozada Aponte, las cantidades de $2,000 y $1,500, respectivamente, por concepto de daños mentales.

Acordamos revisar.

## II

Existe consenso casi unánime en la comunidad médica de que la biopsia renal es el único medio disponible para llegar a un diagnóstico definitivo de las enfermedades que se sospechaba padecía el paciente. Así lo confirmaron los peritos presentados durante el proceso. El de la parte demandante, urólogo, Dr. José Díaz Buxó expresó: "verdaderamente, la única manera de establecer definitivamente, sin lugar a dudas, la causa de la glomerulonefritis, es el tejido, el examen del tejido a través de una biopsia renal." T.E., Vol. 1, pág. 215. El perito de los demandados, urólogo, Dr. Manuel Martínez Maldonado, igualmente indicó: "la única manera certera de hacer esa . . . ese diagnóstico es haciendo una biopsia renal." T.E.,

_____

(3) "Radiografía de un territorio arterioso que se obtiene inyectando en el tronco principal una sustancia opaca a los rayos X." *Diccionario de Ciencias Médicas Dorland, op. cit.,* pág. 145.

Vol. 3, pág. 105. Las autoridades coinciden en este extremo. De hecho, "[a]unque la biopsia renal percutánea conlleva riesgos significativos, puede ser extremadamente útil para diagnóstico, terapia y pronóstico, teniendo conocimiento exacto de qué cambios histológicos tienen lugar en el riñón. La biopsia es la única forma de obtener esa información". (Traducción nuestra.) J. Weller, *Fundamentals of Nephrology*, Maryland, Harper & Row, Pubs., 1979, pág. 89.

El valor e importancia de este método diagnóstico es ampliamente reconocido. La biopsia renal "constituye un procedimiento diagnóstico valioso que sirve también como guía para el tratamiento racional. La técnica ya ha sido bien establecida, y proporciona con frecuencia tejido suficiente para microscopia ordinaria y electrónica y para examen inmunofluorescence". (Traducción nuestra.) D. R. Smith, *General Urology*, 8va ed., California, Lange Medical Pubs., 1975, págs. 357, 358. Se suele expresar que "la biopsia renal es ciertamente el único método de hacer un diagnóstico histológico exacto durante la vida del paciente". (Traducción nuestra.) H. E. Wardener, *The Kidney—An Outline of Normal and Abnormal Structure and Function*, 4ta ed., Londres, Churchill Livingstone, 1973, pág. 17. D. A. K. Black, *Renal Disease*, 2da ed., Philadelphia, F. A. Davis Company, 1967, pág. 170. El método no es infalible. Debido a lo pequeño de la muestra (alrededor de 25 glomérulos de aproximadamente un (1) millón), a menudo el espécimen puede tratarse de tejido normal y sano, y el resultado ser negativo, aun cuando exista el padecimiento. Por ello algunas autoridades opinan que la prueba está contraindicada en infecciones de riñones y solamente debe usarse después de haberse agotado otros métodos. *Kidney and Urinary Tract Infections*, Indianapolis, Lilly Research Laboratories, 1971, pág. 53; B. M. Brenner y F. C. Rector, *The Kidney*, Filadelfia, W. B. Saunders Co., 1976, pág. 1080.

No obstante, se admite generalmente que para conocer con

precisión el padecimiento de un paciente con diagnóstico preliminar, entre otros, de pielonefritis o glomerulonefritis, resulta indispensable practicar una biopsia renal. Tal decisión debe adoptarse al sopesar la necesidad y urgencia de realizarlo frente a sus potenciales complicaciones inherentes, las cuales "son usualmente leves y transitorias". (Traducción nuestra.) W. Sunderman y W. H. Green, *Laboratory Diagnosis of Kidney Diseases*, St. Louis, 1970, pág. 371.

Una consecuencia inevitable de la biopsia renal percutánea, es la hematuria, siendo frecuentemente mínima y transitoria. M. Immergut y A. Plotkin, *Hemorrhage Following Needle Biopsy of Kidney*, 211 J.A.M.A. 827 y ss. (1970). Sin embargo, no puede descartarse la posibilidad postbiopsia de un cuadro de hematuria de carácter *serio*, como una de las probables consecuencias, aunque mínimas, de las cuales no se está exento, aun en las manos médicas más hábiles. Ello es por razón de que la biopsia renal percutánea es un procedimiento invasivo que "[a] pesar . . . de la pielografía (⁴) y la fluoroscopia, . . . (⁵) se realiza a ciegas". (Traducción nuestra.) Immergut, *op. cit.*, pág. 828.

### III

En el caso de autos, el codemandado doctor Corretjer —quien había realizado numerosas biopsias renales sin haber confrontado nunca complicaciones serias— luego de innumerables exámenes y análisis que no descubrieron la etiología de la hematuria, usando su mejor juicio optó por corroborar su diagnóstico preliminar. Con ese propósito realizó la biopsia renal en Alberto, que era el único medio que consideró apropiado y tenía disponible. La corrección del procedimiento

---

(⁴) "Registro radiográfico de las vías excretoras del riñón." *Diccionario de Ciencias Médicas Dorland, op. cit.*, pág. 1094.

(⁵) "Examen de la imagen formada en una pantalla fluorescente por un cuerpo interpuesto entre ésta y una fuente de rayos Roentgen." Íd., págs. 565 y 1207.

que siguió al realizarla no fue ni ha sido cuestionada, aunque según indicáramos, tuvo una complicación la lesión vascular que desencadenó el grave episodio que posteriormente requirió la nefrectomía. Durante esa prueba se siguieron las prácticas aceptadas en la comunidad médica. Igual conducta se observó en el cuidado postbiopsia. El paciente fue recluido, permaneciendo en cama con el mínimo movimiento posible según dictan las normas prevalecientes en la medicina. Una vez surgió y continuó esa inesperada complicación de hematuria seria, también se actuó conforme las normas de cuidado médico. Se mantuvo a Alberto bajo una estrecha vigilancia de su pulso, respiración, presión sanguínea, orina y hematocrito. Ante su falta de mejoría[6] y recuperación, se intentó localizar el área de sangría a través de una exploratoria. No fue posible encontrarla. Se procedió entonces a realizar la exploratoria y eventualmente —ante la condición del riñón— la nefrectomía como único curso de acción por imperativo de las circunstancias. Smith, *op. cit.*, pág. 357.

El sitio específico del área de sangría era un dato esencial para tener una oportunidad —aunque no garantizada— de salvar el riñón en situaciones como la de Alberto. Los peritos presentados en el proceso convinieron en que un arteriograma pudo haberlo señalado.[7] En definición pericial el doctor Díaz Buxó expresó:

Un arteriograma es la infusión de material de contraste. Por esto quiero decir, cualquier materia que sea "radio opaca",

---

[6] "Las potenciales complicaciones serias . . . casi siempre cesan sin necesidad de terapia específica, transfusión u operación alguna." (Traducción nuestra.) J. J. Kaufman, *Advances in Diagnostic Urology*, Boston, Little, Brown and Company, 1964, pág. 133.

[7] En ello coinciden los peritos de los demandantes (Dr. Fernando Recio, T.E., Vol. 1, pág. 60, y el Dr. José A. Díaz Buxó, T. E., Vol. 1, págs. 229–230, 244–247, y 213), así como el de los demandados (Dr. Manuel Martínez Maldonado, T.E., Vol. 3, págs. 250–260, y 271–273).

En adición, el médico que realizó la exploratoria y nefrectomía, doctor Medina Rosario, expresó que tuvo que extirparle el riñón, pues no se encontró el área de la sangría. Admitió que un arteriograma pudo haber ayudado a localizar el sitio exacto de sangramiento. T.E., Vol. 1, págs. 105–112.

que al tomar Rayos X aparece como una mancha del contraste, usualmente blanca, se inyecta en un vaso sanguíneo, en una arteria, se inyecta directamente en el sitio que se quiere diagnosticar, y por eso se le llama selectivo, un arteriograma selectivo, y nos deja saber el flujo sanguíneo a través de ese vaso sanguíneo. En otras palabras, nos enseña la distribución de la sangre desde el punto de inyección hasta el punto de distribución del flujo sanguíneo. T.E., Vol. 1, págs. 173–174.

El conocimiento del lugar de la sangría pudo haber reducido la posibilidad de la nefrectomía realizada. Sobre el particular el cirujano Medina Rosario expuso que "[s]i se localiza el área, se pudo haber hecho o una ligadura de una sutura del área de la lesión (8) o haber hecho una nefrectomía parcial". T.E., Vol. 1, pág. 123. En términos semejantes se expresó el Dr. Fernando Recio, quien indicó que "en un caso como este, que obviamente el sangramiento era masivo, se pudo, si se hubiese hecho la arteriografía, *y se hubiese localizado el vaso sangrante,* se pudo haber hecho una embolización con coágulo, o con teflón o un material inerte y selectivamente haber embolizado, o sea, haberle puesto un tapón, por as[í] decirlo, a la arteria que estaba sangrando. Esto, naturalmente hubiese resultado en una pérdida de parte de la función renal, ya que la parte distal al vaso se hubiera muerto necrosado, pero se hubiera salvado, básicamente el riñón. La otra alternativa, teniendo uno el área de sangramiento, era explorar, drenar el hematoma y posiblemente hacer una nefrectomía parcial, o sea, sacar el pedazo de riñón en la parte afectada, con control de vasos sanguíneos". T.E., Vol. 1, págs. 62–63.

▮▮▮ Hechas estas aclaraciones, debemos concluir que conocido el lugar exacto de la sangría aumentaban las posibilidades de haber salvado total o parcialmente el riñón de Alberto. Sin embargo, es cuestionable que jurídicamente po-

---

(8) El Dr. Manuel Martínez Maldonado descartó la posibilidad de este procedimiento. T.E., Vol. 3, págs. 282–284.

damos adoptar como axioma de responsabilidad la ausencia del equipo por su valor potencial de diagnosticar el área precisa de la sangría. Aunque aspiramos al ideal de excelencia en la práctica de la medicina, la determinación de lo que constituye negligencia, por la posesión o carencia de determinado equipo, necesariamente se nutre de diversos factores. Esta fórmula se explica, porque al "fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos y condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos". *Oliveros* v. *Abreu,* 101 D.P.R. 209, 226 (1973).

■ Para evaluar en el caso de autos si existía el deber del Estado de poseer un equipo de arteriografía en el Departamento de Urología del Hospital Regional —que es la premisa cardinal en que basó el foro de instancia la responsabilidad— como lugar donde se realizaban biopsias renales, debemos considerar ese deber configurado en el contexto de la figura de la previsibilidad, y el elemento rector que la complementa: la *razonabilidad*. Ésta a su vez se nutre de factores adicionales tales como onerosidad, apremio, recursos, y sobre todo, el reconocimiento y aceptación de alternativas por la profesión médica.

La hematuria de carácter serio como resultado de biopsias de esta índole es una probabilidad latente, y a veces inevitable, aun utilizando las mejores técnicas actuales. Algunos consideran que estas serias complicaciones ocurren entre el 5 al 10% de las situaciones. Wardener, *op. cit.*, pág. 17. Otros las sitúan específicamente en el 5% de los casos. J. J. Kaufman, *Advances in Diagnostic Urology*, Boston, Little, Brown and Company, 1964, pág. 133. Frente a estos datos, otro autor nos indica que el número de complicaciones que tiene como resultado una nefrectomía se encuentran en un nivel bajo, entre el .02 al .1% de las ocasiones. J. B. Dosseter, *In-*

*suficiencia Renal*, Barcelona, Ed. Toray, 1974, pág. 63. El testimonio del perito de la parte demandante, doctor Díaz Buxó, confirma esta reducida incidencia. (⁹)

---

(⁹) Interrogado sobre el índice de complicaciones de la biopsia renal percutánea, el doctor Díaz Buxó atestó:

"JUEZ:

"P. Doctor, usted habló de la biopsia renal, dice que es una prueba electiva y que el índice de complicaciones es alto.

"DR. DÍAZ:

"R. Cierto.

"P. ¿Usted nos podía dar, en términos numéricos cuál es el índice de complicaciones?

"R. Muy bien.

"P. En una y en otra biopsia, porque usted está hablando de índice de complicaciones en qué tipo de biopsia, ¿en la que se hizo en este caso?

"R. En la biopsia percutánea, s[í]. Me limité a hablar de las complicaciones en la biopsia percutánea, en la biopsia cerrada. Para usar números que no provengan de una serie, sino que sea una serie colectiva de la literatura incluyendo varios miles de series, que creo es lo más justo, ah . . . vamos a hablar de las complicaciones que mencionamos anteriormente. Ah . . . primero: morbilidad en general. Ah . . . cualquier problema, cualquier cosa que cause dolor, que cause molestia, que determine que el paciente tiene que quedarse en el hospital más de las 24 horas, pues la incidencia es de alrededor del 9%, y varía entre 4.6 y 11%, de los pacientes.

"P. Perdón, ¿me quiere repetir eso, por favor?

"R. S[í], entre 4.6 y 11% de los pacientes tienen algún tipo de problema. Así que alrededor del 8 ó 9%.

"Específicamente, hematuria gruesa varía entre el 3 y el 40% de las series. De hecho, la serie de 40% es una de las más grandes, 'Welt.' En nuestra serie de mil casos consecutivos, me parece que fu[e] . . . bueno, —no me parece— lo digo específicamente, fu[e] 6.9% de los pacientes tuvieron hematuria gruesa. Hematomas perirenales, clínicamente hablando, algo que se manifieste como en este caso, como una masa, dolor, baja en el hematocrito, evidencia clínica, es de alrededor del 1.5%, uno y medio por ciento, de uno a dos pacientes, en cien, van a tener un problema de esa magnitud. Pacientes que requieren transfusiones debido a que la sangría es de tal grado que indica clínicamente que se deben de recibir, entre medio por ciento, entre punto cinco por ciento y tres por ciento de los pacientes en la serie grande de la literatura.

. . . . . . .

"R. Que requirieron transfusiones, ya fueran hematoma perirenal, hematuria, ah . . . ah . . . sangría interna por la razón que fuera, *que requirieron cirugía, en la serie nuestra de mil casos, dos pacientes en mil, requirieron cirugía. Y en la literatura varía cerca de estos números. Varía entre uno por ciento, entre uno y cien y uno, en dos mil pacientes. Así que la variedad es increíble. Muy pocos pacientes, en otras palabras, requirieron*

■ En síntesis, la experiencia clínica en y fuera de Puerto Rico tiende a sostener el criterio y juicio profesional original del doctor Corretjer al optar por realizar la biopsia como método confiable, de riesgos mínimos, recomendado para corroborar diagnósticos relacionados con el padecimiento de Alberto. *"El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino a aquél que es probable que suceda y que llevaría a una persona prudente a anticiparlo.* En suma, la mítica pero indispensable figura del 'hombre prudente y razonable' define la norma de conducta, y el hospital será responsable si ocurre un daño que en las particulares circunstancias del caso pudo razonablemente haberse previsto y evitado." (Énfasis suplido y escolios omitidos.) *Hernández* v. *La Capital*, 81 D.P.R. 1031, 1038 (1960).

■ Al tomarse la decisión de explorar el riñón, con el concurso del paciente y sus familiares, ya tenía ante sí el cuadro de la precaria salud de Alberto. Diariamente su condición se iba deteriorando. No podía ser trasladado al Centro Médico sin grave riesgo para su persona. Bajo estas circunstancias no podemos sostener la responsabilidad predicada en la ausencia del equipo de arteriografía. Equivaldría a responsabilidad objetiva o absoluta, lo que representa un obstáculo insalvable que limitaría la iniciativa y discreción de los médicos para actuar en situaciones apremiantes que así lo exigen, aun cuando puedan existir divergencias de criterios respetables en cuanto a uno u otro curso de acción.

■ Lo esencial es dictaminar si el tratamiento es uno aceptable que satisfaga las exigencias generalmente recono-

---

*cirugía, específicamente, de siete series grandes, hubo tres de ellas donde ningún paciente requirió cirugía. En la nuestra, dos en mil, en la de 'Welt', punto cero seis por ciento, que son seis en diez mil y en la de 'Slotkin', tres en mil. Así que cirugía es poco frecuente."* (Énfasis nuestro.) T.E., Vol. 1, págs. 231–233.

cidas por la profesión médica a la luz de los medios modernos de corrección, enseñanza y equipos disponibles. Aquí se observaron. *Núñez v. Cintrón,* 115 D.P.R. 598 (1984) ; *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721 (1984) ; *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983).

Albergamos reservas fundadas, sobre si el arteriograma era el método imperativamente a seguir en los hechos ante nos. Algunas autoridades médicas, aun cuando reconocen el valor e importancia de la arteriografía en situaciones de lesiones renales, indican que "[a]unque ciertos centros son extremadamente entusiastas con relación al tratamiento indicado [arteriograma] nosotros entendemos que no debe ser utilizado rutinariamente y que cada caso debe ser individualizado". (Traducción nuestra.) R. Kendall y L. Karafin, *Renal Injuries,* Med. Trial Tech. Q., 493, 495 (1975).

Con relación a la condición delicada, inestable y fluctuante de Alberto, el doctor Martínez Maldonado, perito de los demandados, se expresó con recelo y cautela sobre la sabiduría de practicarle el arteriograma:

> [Y]o tengo el riñón muy poco lleno de sangre porque el señor ha sangrado mucho y le tengo que inyectar a presión un tinte, pues mire, explotó el riñón porque ahora el riñón no tiene la defensa de estar distendido y poder hacerle resistencia a eso y se va a ir por el sitio de menor resistencia, se va a salir el tinte por el boquete de la aguja y se puede fracturar el riñón literalmente, o sea, fracturar, abrirse, hendirse y el tinte se escaparía al espacio retroperitoneal y es como todos, ese es un tinte que cuando uno se lo pone en la vena a uno, pues circula, el riñón mismo lo bota, pero si se le acumula a usted en los espacios abdominales le d[a] una peritonitis química. Es una cosa que no, que no contiene ningún negocio de estar ahí. No tiene nada que buscar en ese sitio. De modo que, me parece, que porque se hizo bajo las circunstancias lo que fu[e], humanamente posible hacerse. T.E., Vol. 3, págs. 139–140.

■ Recapitulando, ante el cuadro clínico individual de

Alberto, el doctor Corretjer usó su buen juicio profesional. El mismo estuvo enmarcado en los linderos de lo razonable y aceptado por amplios sectores de la profesión médica. Presumiendo que fue erróneo, la existencia de criterios divergentes constituye defensa válida eximente de responsabilidad, debido a la amplia discreción profesional que es menester reconocer. *Cruz* v. *Centro Médico de P.R.*, supra, págs. 731–732. Así explicó el doctor Corretjer su decisión al exponer que consideró el arteriograma, pero lo descartó dada las condiciones del paciente. Repetimos, este caso refleja la existencia de criterios dispares sobre si determinado procedimiento pudo realizarse en las condiciones del paciente. Ante esta legítima divergencia entre autoridades médicas, el juicio médico merece deferencia. *Oliveros* v. *Abréu*, supra.

## IV

Finalmente, tampoco puede sostenerse la determinación del tribunal de instancia en el sentido de que medió negligencia al realizarse la biopsia sin un diagnóstico diferencial previo. En el caso particular de Alberto, las enfermedades probablemente padecidas eran glomerulonefritis o pielonefritis. Se desconocían sus posibles causas. El tribunal concluyó que exámenes tales como "Anticuerpo Antinucleares"; "LE Clot test" para lupus y "ASO titer" hubiesen dado una tendencia indicativa de glomerulonefritis. Por lo tanto, al no realizarlos no se distinguió entre pielonefritis y glomerulonefritis. Erró.

■ La doctrina de diagnóstico diferencial —*Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 183 (1974) y *Pérez Cruz* v. *Hosp. La Concepción*, supra— está basada en la exigencia de un procedimiento para distinguir entre posibles padecimientos que requieren tratamientos diferentes y específicos. Esa no es la situación de autos. Aquí, la distinción entre uno u otro padecimiento no hubiese descartado la necesidad de la biopsia renal la cual estaba indicada como único medio disponible para tratar de hacer un diagnóstico preciso. Black,

*op. cit.*, pág. 170; Wardener, *op. cit.*, pág. 17; Weller, *op. cit.*, pág. 89; Sunderman y Green, *op. cit.*, pág. 367.

*Se dictará sentencia que revoque la del Tribunal Superior, Sala de Caguas.*

El Juez Asociado Señor Rebollo López concurre en el resultado sin opinión.