# 2001 DTA 134

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL VI DE CAGUAS/HUMACAO/GUAYAMA**

ANA L. RODRIGUEZ Y OTROS
Demandantes-Apelados

v.

DR. JOSE ALVARADO Y OTROS
Codemandados

HOSPITAL RYDER MEMORIAL INC.
Codemandado-Apelante

Núms. Cons. KLAN-2000-01030 / KLAN-2000-01034

San Juan, Puerto Rico, a 16 de marzo de 2001

Panel integrado por su Presidente, el Juez Colón Birriel,
la Juez Feliciano Acevedo y el Juez Escribano Medina

Escribano Medina, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

El Hospital Ryder Memorial, Inc., el Dr. José Alvarado y la Asociación de Garantía Seguros Misceláneos en el interés del Dr. Alvarado, (en adelante "*los apelantes*"), solicitan la revocación de una Sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Humacao, (Hon. Luis Amorós Alvarez, J.), el 9 de junio de 2000 y notificada de su archivo en autos el 15 de junio del mismo año.

Mediante ésta, se le impuso responsabilidad a todos los apelantes por incurrir en impericia médico-hospitalaria al no efectuar el procedimiento quirúrgico acordado y, además, por no informarle a la Sra. Ana Luisa Rodríguez (en adelante, "*Ana Luisa*") con posterioridad a la intervención quirúrgica, que en vez de realizarle una histerectomía vaginal, se le hizo una traquelectomía vaginal. Como resultado del dictamen, quedaron obligados a resarcir solidariamente en daños físicos y sufrimientos y angustias mentales a Ana Luisa y a sus causahabientes, Luis Andrés Colón, Sonia Noemí Colón Rodríguez, Luis Javier Colón Rodríguez y Sandra Enid Colón Rodríguez (en adelante "*los apelados*"), en sufrimientos y angustias mentales. Asimismo, se les impuso el pago de las costas, gastos, intereses pre-sentencia y honorarios de abogados.

Inconforme, los apelantes acuden ante nos, mediante recursos de apelación por separado. [1]

### II

El 18 de febrero de 1987, Ana Luisa, quien contaba entonces con 47 años de edad, acudió a la clínica externa de ginecología y obstetricia del Hospital Ryder en la municipalidad de Humacao, con el cual tenía su plan médico. Allí fue atendida por el co-apelante, Dr. José Alvarado. Durante su primera visita médica, Ana Luisa se quejó de sangrado vaginal, incontinencia urinaria y dolor durante las relaciones sexuales. El diagnóstico del Dr. Alvarado fue de prolapso uterino grado III y de cistocele severo (prolapso de la vejiga, lo cual producía la incontinencia urinaria). Se le ordenó una prueba de papanicolaou (Pap's Smear o prueba de cáncer de cervix o cuello del útero) y se le dio cita para dentro de dos semanas debido a que se contemplaba una histerectomía vaginal (remover el útero a través de la vagina).

El 17 de marzo de 1987, Ana Luisa fue sometida a una intervención quirúrgica por el Dr. Alvarado en el Hospital Ryder. Del récord clínico de la paciente, se desprende que no se realizó la histerectomía, sino que la intervención médica consumada fue descrita como una traquelectomía vaginal (remoción del cuello del útero) y corporrafía anterior. Alegadamente, el cuerpo uterino (matriz) no se removió, debido a razones técnicas, que se explicaron como sangrado excesivo que ponía en peligro la vida de la paciente. Luego de un proceso post operatorio, la paciente fue dada de alta sin quejas, el 21 de marzo de 1987.

Posteriormente, el 20 de julio de 1987, Ana Luisa acudió al Hospital Ryder quejándose de sangrado vaginal,o sea, transcurrido cuatro (4) meses luego de la operación. Del examen que le hizo el Dr. Alvarado, resultó ser, más bien, sangrado de granulación del cuello de la vagina, el cual trató con aplicación de nitrato de

plata y se le dio cita de seguimiento para una semana más tarde. La próxima visita de Ana Luisa a la oficina del Dr. Alvarado ocurre el 29 de julio de 1987, durante la cual se determinó que el sangrado por granulación proveniente de la vagina había sanado.

Surge del récord clínico del Hospital Ryder que Ana Luisa acudió a la Sala de Emergencia el 29 de enero de 1988. Alegaba, entonces, haber tenido un sangrado vaginal, por lo cual fue tratada esa noche. Al día siguiente, el 30 de enero de 1988, el Dr. Alvarado examinó a Ana Luisa en su oficina, pero, alegadamente, no encontró evidencia alguna de dicho sangrado. Le ordenó varios análisis y le recetó ampicilina, que es un antibiótico. El 12 de febrero de 1988, Ana Luisa visitó nuevamente al Dr. Alvarado con los resultados de las pruebas de laboratorio. Nuevamente, se le dio de alta.

Al continuar los sangrados post operatorios, Ana Luisa recurrió a otro obstetra-ginecólogo, Dr. Enrique Rodríguez Declet, quien a su vez la refirió para un examen radiológico. El 19 de mayo de 1988, el Dr. Ramón Morales Sánchez le practicó un sonograma pélvico. Entre los hallazgos del Dr. Morales Sánchez se destaca un papanicolau clase II, que implica infección. Además, reveló un quiste en el ovario derecho.

Ante la discrepancia de la información suministrada por Ana Luisa a los efectos de que el Dr. Alvarado le había extirpado el útero el 17 de marzo de 1987 y con el estudio radiológico del Dr. Morales indicando que el útero no había sido removido quirúrgicamente, el Dr. Rodríguez Declet ordenó un segundo sonograma pélvico, el cual fue practicado por la Dra. Carmen Negrón, y el mismo comprobó la presencia del útero en Ana Luisa. La lectura no sugirió ni fibrosis, ni masas.

Comprobado el hecho de que no se le hubiese practicado la histerectomía vaginal, el Dr. Rodríguez Declet procedió a informarle a Ana Luisa sobre la presencia del útero y le indicó que se reuniera con el Administrador del Hospital Ryder y el personal médico que la atendió durante su operación para aclarar lo sucedido durante su intervención quirúrgica.

El 17 de junio de 1988, Ana Luisa se personó al Hospital Ryder donde se entrevistó con el Sr. Saturnino Peña Flores, Director Ejecutivo de la Institución; el Dr. José R. Alvarez, cirujano, y Director Médico del Ryder y el co-demandado-apelante, Dr. José Alvarado.

Al ser confrontados con la realidad de que el útero no le había sido extirpado, tanto la institución, como el Dr. Alvarado, se ofrecieron para corregirle los problemas de salud que presentaba la demandante mediante el proceso de someterla a una histerectomía abdominal con los médicos del Hospital Ryder, lo cual fue rechazado por Ana Luisa. El Hospital Ryder se comprometió a pagar, como pagó, la segunda operación.

El 24 de junio de 1988, Ana Luisa fue ingresada en el Hospital San Rafael, en Caguas, Puerto Rico, bajo las órdenes del Dr. Rodríguez Declet para realizarle una histerectomía abdominal previo a un diagnóstico de sangrado uterino anormal post operatorio.

Al no visualizarse la entrada al útero, debido a la operación de traquelectomía realizada por el Dr. Alvarado, el cual impedía un proceso menos invasivo, como hubiere sido la dilatación o curetaje que era lo indicado, el Dr. Rodríguez Declet tuvo que recurrir a una laparotomía exploratoria consistente en una sección abdominal.

Durante la operación, el Dr. Rodríguez Declet removió el útero y ambos ovarios. Ana Luisa fue dada de alta el 27 de junio de 1988. La última visita de seguimiento con el Dr. Rodríguez Declet fue en mayo de 1989.

Así las cosas, Ana Luisa y sus causahabientes anteriormente mencionados, presentaron una demanda el 16 de marzo de 1989. Tras varios incidentes procesales y de un largo juicio, el foro de instancia dictó sentencia el 9 de junio de 2000, y notificada el 15 de junio del mismo año, declarando CON LUGAR la demanda de epígrafe y obligó a los apelantes a satisfacer, solidariamente, la siguiente indemnización:

*"1. Por los daños físicos y por las angustias y sufrimientos mentales sufridas por Ana Luisa Rodríguez, la suma de $75,000.00.*

*2. Incapacidad de las funciones fisiológicas generales de la Sra. Ana Luisa Rodríguez, la suma de $25,000.00.*

*3. Luis Andrés Colón, esposo de la demandante, la suma de $25,000.00 por concepto de angustias mentales.*

*4. Sonia Noemí Colón Rodríguez, hija de la demandante, la suma de $15,000.00 por concepto de angustias mentales.*

*5. Luis Javier Colón Rodríguez, hijo de la demandante, la suma de $15,000.00 por concepto de angustias mentales.*

*6. Sandra Enid colón Rodríguez, hija de la demandante, la suma de $15,000.00 por concepto de angustias mentales.*

*7. Se ordena a cada uno de los demandados a pagar la suma de $15,000.00 por concepto de honorarios de abogados por su temeridad; además, se le impone a los demandados el pago de intereses presentencia desde la radicación de la demanda.*

*8. Se impone a los demandados, el pago de costas del litigio."*

El 22 de junio de 2000, el Tribunal *a quo* notificó una sentencia enmendada. Posteriormente, los aquí apelantes presentaron una moción al amparo de la Regla 43.3 de las de Procedimiento Civil, solicitando se enmendara la sentencia a los efectos de hacer determinaciones de hechos y conclusiones de derecho adicionales. El 3 de julio de 2000, el foro de instancia la declaró SIN LUGAR.

No obstante, el Tribunal de Primera Instancia, *motu proprio*, emitió una segunda orden y notificación enmendada en cuanto a la solicitud de Determinaciones Adicionales que se produjo el 10 de julio de 2000, concediendo a la parte demandante-apelada diez (10) días para expresarse en torno a dicha solicitud. El 18 de agosto de 2000, el foro de instancia determinó nuevamente denegar la referida solicitud al amparo del Regla 43.3, *ante*.

Inconforme, los apelantes acuden ante nos alegando los siguientes errores:

*"A- KLAN-00-01030 del Hospital Ryder, Inc.:*

*1. Erró manifiestamente el Honorable Tribunal de Primera Instancia, Sala Superior de Humacao, al apreciar en forma arbitraria, prejuiciada y parcializada la prueba desfilada estableciendo así determinaciones de hechos y conclusiones de derecho incompletas y que son claramente contrarias a la misma.*

*2. Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Humacao, al determinar de forma manifiestamente arbitraria, caprichosa, prejuiciada y parcializada que mediaron daños como consecuencia de la intervención del aquí codemandado-apelante y al haber estimado excesivamente la cuantía de los mismos cuando la prueba fue contraria a ello.*

*3. Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Humacao, al determinar de forma manifiestamente arbitraria, caprichosa, prejuiciada y parcializada que medió temeridad por parte de los codemandado-apelante, [sic] imponiéndole honorarios de abogado, costas, gastos e intereses desde la radicación de la demanda a favor de la parte demandante, aun cuando el compareciente presentó prueba*

*pericial para sustentar plenamente su teoría de ausencia de negligencia, relación causal y daños a través de un perito obstetra-ginecólogo de reconocida reputación que apoyó sus teorías y opiniones en lo que establecen las autoridades en el mencionado campo de especialidad, y mientras la parte apelada presentó a un médico generalista de dudosas cualificaciones como tal.*

*B- KLAN-00-01034 de la Asociación de Garantía de Seguros Misceláneos en el interés del codemandado Dr. José Alvarado:*

*1. Erró el Tribunal de Primera Instancia al acceder a la petición de los demandantes-apelados a que se obligara al codemandado Dr. José Alvarado a comparecer al tribunal el primer día del juicio para que testificara a favor de los demandantes sin que los demandantes-apelados lo hubieran anunciado como su testigo o lo hubieran citado como les correspondía.*

*2. Erró el Tribunal de Primera Instancia al concederle a los demandantes-apelados un receso de cuatro meses entre el testimonio directo y el contrainterrogatorio del Dr. Figueroa Longo, perito de la parte demandada, sobre las objeciones de los abogados de las partes codemandadas y a pesar de que al comenzar el testimonio del Dr. Juan Figueroa Longo, los abogados de la parte demandante indicaron estar listos para la continuación del juicio.*

*3. Erró el Tribunal de Primera Instancia al darle crédito al testimonio de la demandante Ana Luisa Rodríguez el cual fue ampliamente impugnado.*

*4. Erró manifiestamente el Tribunal de Primera Instancia al apreciar en forma arbitraria, prejuiciada y parcializada la prueba pericial y dar más peso al testimonio del generalista Dr. Barrera que al especialista en ginecología y obstetricia, Dr. Figueroa Longo.*

*5. Erró el Tribunal de Primera Instancia al no ordenar la transcripción del testimonio del codemandante Luis Andrés Colón para someterla al Departamento de Hacienda, luego de que éste, bajo juramento, admitiese la comisión de un delito público.*

*6. Erró el Tribunal de Primera Instancia al darle crédito al testimonio de los peritos sicólogos y siquiatras quienes por admisión propia declararon que no habían atendido profesionalmente a la demandante Ana Luisa Rodríguez hacía por lo menos cinco años.*

*7. Erró el Tribunal de Primera Instancia al creerle el testimonio al Dr. Agustín García, siquiatra, quien declaró que anualmente llamaba telefónicamente a la demandante para saber cómo se encontraba, anotarlo en su récord y sin cobrarle honorarios.*

*8. Erró el Tribunal de Primera Instancia al no darle crédito al récord médico de la paciente en el Ryder Memorial Hospital, evidencia estipulada por las partes y de donde surgía, entre otras cosas, que la demandante no estaba sangrando al consultar al Dr. Alvarado en su primera visita el día 18 de febrero de 1987.*

*9. Erró el Tribunal de Primera Instancia al no acceder a la solicitud de determinaciones de hechos y conclusiones de derecho adicionales sometidas por los demandados-apelantes.*

*10. Erró el Tribunal de Primera Instancia al concluir que la parte demandada-apelante fue temeraria al defenderse de esta reclamación e imponerle por ello el pago de honorarios e intereses."*

Hemos analizado los alegatos de las partes, a la luz de la transcripción de los procedimientos, los autos y el derecho aplicable. En consideración a ello, resolvemos.

## III

Al examinar los recursos que nos atañen, debemos considerar la normativa aplicable a las reclamaciones por responsabilidad civil extracontractual y, en particular, la responsabilidad médico-hospitalaria.

La responsabilidad civil extracontractual tiene como base jurídica, en nuestro ordenamiento, el Artículo 1802 del Código Civil que establece, en lo pertinente, *"el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado"*. 31 L.P.R.A. sec. 5141. *Ortega et al. v. Pou et al.,* 135 D.P.R. 711 (1994); *Santiago Otero v. Méndez,* 135 D.P.R. 540 (1994).

De igual manera, una entidad dedicada al servicio de la salud responde por la negligencia o impericia de sus empleados bajo el Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142. Es decir, que la prestación de los servicios médicos, sin la debida diligencia, puede generar la responsabilidad civil del médico u hospital, en el supuesto de que la falta de diligencia imputada cause un daño. La norma que aplica a estos casos es que, para que nazca la responsabilidad civil médica, el promovente de la acción tiene que establecer la ocurrencia de un acto médico culposo o negligente, la producción de un daño real, y la relación causal entre el acto médico y el daño sufrido. *Soto Cabral v. E.L.A.,* 138 D.P.R. 298, 308-309 (1995).

En materia de responsabilidad médico-hospitalaria por alegada mala práctica o impericia médica, corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del demandado fueron el factor que con mayor probabilidad ocasionó el daño sufrido, y establecer, además, el vínculo causal requerido por el Art. 1802 del Código Civil. *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639, 650 (1988); *Ríos Ruiz v. Mark,* 119 D.P.R. 816, 821 (1987); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719, 744 (1983); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 521 (1980).

Para establecer *prima facie* un caso de daños y perjuicios por negligencia y/o impericia médica, el demandante tiene que: (1) que presentar prueba sobre las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa de la lesión sufrida por el paciente. Es decir, corresponde al demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de determinado tipo de pacientes. Esa prueba deberá demostrar cuáles son las exigencias de toda la profesión a la luz de los conocimientos científicos disponibles mediante los medios de comunicación y programas de educación continuada, así como las normas de consentimiento informado aplicables al caso y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández, supra,* a las págs. 650-651; *Medina Santiago v. Vélez,* 120 D.P.R. 380, 385 (1988).

Es norma reiterada por nuestro Tribunal Supremo que, en casos de responsabilidad profesional médica, si de la evidencia surgen varias causas probables del daño, no puede imponérsele responsabilidad al médico, a menos que del examen de la totalidad de la prueba surja que su actuación negligente es la que mayores probabilidades tiene de haber causado el daño. *Vda. de López v. E.L.A.,* 104 D.P.R. 183 (1975); *Ramos Orengo v. La Capital, supra,* a la pág. 328; *Sáez v. Municipio de Ponce, supra,* a las págs. 543-544.

En Puerto Rico, un médico está obligado a responder por los daños y perjuicios que cause únicamente cuando actúa negligentemente, con descuido o con falta de pericia profesional. A esos efectos, es menester reconocer que en nuestro ordenamiento jurídico, las normas mínimas de cuidado, conocimiento y destrezas requeridas a los médicos en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevalecientes en la medicina, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. *Cruz v. Centro Médico de P.R., supra,* a la pág. 731 (1983); *Oliveros v. Abréu,* 101 D.P.R. 209, 226 (1973).

Lo dicho demuestra, por un lado, que en el diagnóstico, el error de juicio es aceptable como defensa cuando está presente una de las siguientes circunstancias: (1) Cuando existe una duda razonable sobre la condición o enfermedad del paciente; (2) cuando las autoridades médicas reconocidas están divididas en cuanto a cuál debe ser el procedimiento de diagnóstico a seguirse; o (3) cuando el diagnóstico se hace después de un esfuerzo concienzudo del médico para enterarse de los síntomas y de la condición del paciente. Por otro lado, en cuanto al tratamiento, se ha dicho que la defensa de error de juicio sólo debe aceptarse cuando las autoridades médicas reconocidas están en desacuerdo en cuanto al tratamiento que corresponde dar. *Oliveros v. Abréu, supra*, a las págs. 227-228. No podemos perder de vista que en el tratamiento de un paciente, el médico posee amplia discreción profesional y que éste no incurre en responsabilidad si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica. Constituye una defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso. *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985).

La doctrina de que un error honesto de juicio por parte del médico no genera responsabilidad, favorece que los médicos hagan uso de su criterio profesional informado, enriquecido con la experiencia y la madurez; mas no significa una renuncia del foro judicial a su función adjudicativa de determinar en cada caso individual si la actuación del profesional es razonable, a tenor con el estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, y si genera responsabilidad. *Cruz v. Centro Médico de P.R., supra*, a la pág. 736.

A la luz de la normativa antes expuesta, hemos evaluado las determinaciones de hechos formulados por el Tribunal de Primera Instancia en la sentencia apelada, la prueba testifical que surge de la transcripción del juicio en su fondo, los autos y los alegatos, y debemos resolver que no incidió el foro *a quo* al encontrar responsables a los apelantes al no informarle y explicarle a Ana Luisa los resultados post operatorios. Sin embargo, no somos de la opinión de que los apelantes fueran responsables de negligencia en daños físicos. Explicamos.

Al considerar la responsabilidad por impericia médico-hospitalaria de los apelantes, en cuanto a si engañaron a su paciente Ana Luisa, ocultándole y haciéndole creer que le habían practicado una histerectomía vaginal cuando lo cierto fue que no la realizaron, es pertinente examinar las determinaciones de hechos del Tribunal *a quo*, que están recogidas en la sentencia apelada como sigue:

*"5. El próximo día 17 de marzo de 1987, el codemandado doctor Alvarado, le practicó a la demandante la supuesta o alegada operación de histerectomía vaginal, así como la reparación del prolapso o descenso de la vejiga, (coloporrafía). La operación para corregir el descenso de la vejiga fue adecuada, pero la histerectomía vaginal no le fue practicada, optando el codemandado, inconsultamente, por practicarle a la demandante una traquelectomía vaginal, operación que consiste [sic] extirpar el cuello de la matriz.*

*22. Todas las visitas de la demandante al doctor Alvarado fueron bajo la creencia absoluta de que se le había practicado una histerectomía vaginal, por lo que ante el continuo sangrado se cuestionaba si tenía una enfermedad terminal, ya que ausente el útero, ella entendía que no debía sangrar.*

*29. La traquelectomía que el doctor Alvarado practicó fue innecesaria. Vista a la luz del historial médico, forzoso es concluir que el sangramiento vaginal que aquejaba a la demandante aumentó en volumen y frecuencia al extremo de llevarla a una segunda operación (histerectomía vaginal [sic]) innecesaria de haberse realizado la histerectomía vaginal para la cual fue ingresada e intervenida. Ello es así, aun cuando la coloporrafía realizada corrigió la incontinencia urinaria que padecía. El referido codemandado se apartó de los estándares de la práctica generalmente aceptados en el campo de la medicina gineco-obstétrica, entre otros señalamientos que hacemos en el curso de esta Sentencia, al no llevar a cabo la histerectomía vaginal que había comunicado a la demandante que habría de realizar y ocultando por un (1) año y dos (2) meses que la misma no fue practicada hasta que fue examinada por el doctor Rodríguez Declet. Se apartó igualmente de dichos estándares al ocultarle que había practicado otra operación como fue la traquelectomía, en lugar de la*

*histerectomía, manteniéndola ajena y en desconocimiento de todo lo ocurrido. Igualmente se apartó de dichos estándares al no percatarse hasta el mismo momento de la operación que alegadamente su cuello de la matriz era extremadamente largo y que no había tal descenso del útero.*

*31. El demandado, sin la autorización o el consentimiento de la demandante, violando su obligación de médico-paciente y la integridad física de ésta, procedió a realizar en la demandante una traquelectomía, operación que no estaba contemplada.*

*37. La demandante fue dada de alta y era su creencia que se le había practicado, tanto la reparación anteroposterior [sic], que sí lo fue, como la histerectomía vaginal contratada. La demandante nunca fue informada por el doctor Alvarado, ni por personal alguno del Hospital, que la histerectomía vaginal no se le había practicado."*

Antes de analizar lo anterior, debemos dejar claramente establecido que, según la prueba pericial dirimida y admitida por el foro de instancia, una histerectomía vaginal total se compone de dos pasos; es decir, primero se extirpa el cuello de la matriz (traquelectomía) y luego se remueve el útero completo (histerectomía). Este procedimiento puede ser tanto vaginal, como abdominal.

En el caso de autos, el codemandado Dr. Alvarado, efectuó la traquelectomía, a pesar de que Ana Luisa no fue intervenida para ese propósito solamente. Sin embargo, luego de analizar los autos, y dado que al evaluar la prueba pericial y documental, estamos en igual posición que el foro apelado, concluimos que el Dr. Alvarado no fue negligente al desistir de completar la histerectomía. Más aún, estamos convencidos de que, el Dr. Alvarado iba encaminado a realizar la histerectomía completa si no hubiese sido por el flujo excesivo de sangre. Como prueba de esto, está el hecho de que logró corregir la incontinencia urinaria y el prolapso de la vejiga al extirpar el cuello del útero. Somos del criterio de que si el Dr. Alvarado continuaba con la intervención quirúrgica, la vida de Ana Luisa hubiese corrido peligro. Por esto, el procedimiento quirúrgico que el Dr. Alvarado efectuó en la demandante cumplió con los términos para lo que fue contratado y así está documentado en el expediente médico. Claramente es una práctica aceptable de la medicina.

En consecuencia, no estamos de acuerdo con la determinación que hizo el Tribunal *a quo*, sobre que el Dr. Alvarado incurrió en negligencia, culpa y dolo al intervenir quirúrgicamente mediando negligencia en la práctica de la obstetricia y ginecología. ██ Si bien es cierto que los tribunales apelativos sólo intervendrán con las determinaciones de hechos y la adjudicación de credibilidad del Tribunal de Primera Instancia, cuando exista pasión, prejuicio o error manifiesto, no es menos cierto que dicha deferencia no es absoluta, y una apreciación errónea de la prueba no está exenta de ser revisada por este tribunal. Por ende, entendemos que incidió el foro apelado al determinar que los apelantes ocasionaron daños físicos a Ana Luisa como consecuencia de la operación. Por ello procede la eliminación de toda partida concedida en daños debido a sufrimientos físicos.

No obstante, el que no se hubiese podido completar la histerectomía, no justifica que el Dr. Alvarado ocultara, y posteriormente engañara, a Ana Luisa sobre los resultados post operatorios. Al igual que un médico tiene el deber de informar los resultados o complicaciones previsibles en una intervención quirúrgica, para obtener un consentimiento informado e inteligente antes de intervenir a un paciente, de igual manera, tiene el deber de informar al paciente sobre los resultados, con posterioridad a la misma.

Por lo anterior, el Dr. Alvarado fue negligente y contumaz al no informar a Ana Luisa sobre lo que le realizó y lo que no le pudo realizar durante la intervención quirúrgica. Por ende, actuó correctamente el foro apelado al responsabilizar a los apelantes por todo el sufrimiento y las angustias mentales que dicha omisión pudo haberles causado a los apelados, por lo que deben indemnizarles.

De otra parte, la gestión judicial de estimación y valoración de daños es difícil y angustiosa, y no existe un sistema mecánico que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas. *Rodríguez Cancel v. E.L.A.*, 116 D.P.R. 443, 451 (1985); *Urrutia v. A.A.A.,* 103 D.P.R.

643 (1975). De ordinario, los tribunales de instancia están en una mejor posición que los tribunales apelativos para evaluar la situación, por cuanto éstos son los que tienen contacto directo con la prueba que a esos efectos presenta la parte que los reclama. *Publio Díaz v. E.L.A.,* 106 D.P.R. 854 (1978). Debido a ello, un tribunal apelativo no intervendrá con la decisión que a ese respecto emitan los tribunales de instancia, a menos que las cuantías sean ridículamente bajas o exageradamente altas. *Valdejuli Rodríguez v. A.A.A.,* 99 D.P.R. 917 (1971); *Urrutia v. A.A.A., supra.*

A esos fines, la parte que solicita la modificación de las sumas concedidas por el tribunal apelado, viene obligada a demostrar la existencia de las circunstancias que hacen meritorio el que se modifiquen las mismas. *Canales Velázquez v. Rosario Quiles,* 107 D.P.R. 757 (1978); *Rodríguez Cancel v. E.L.A., supra.*

En la causa que nos ocupa, no está en discusión que Ana Luisa y los apelados sufrieron daños por los que deben ser compensados adecuadamente, pero coincidimos con el planteamiento de los apelantes de que la compensación concedida por los sufrimientos y angustias mentales es exagerada y debe ser modificada. *Urrutia v. A.A.A., supra.*

Sobre este particular, nos llama la atención que el referido para tratamiento psiquiátrico surge cara al pleito y no está sostenido con prueba anterior. ¿Por qué no surge del récord médico las ansiedades, angustias y alegadas alucinaciones de la demandante hasta después de su reclamación al Hospital Ryder?

En virtud de lo anterior, se modifica la cuantía concedida en sufrimiento y angustias mentales de la siguiente manera:

*"1. Por angustias y sufrimientos mentales sufridas por Ana Luisa Rodríguez, la suma de $15,000.00.*

*2. Luis Andrés Colón, esposo de la demandante, la suma de $5,000.00 por concepto de angustias mentales.*

*3. A cada uno de los codemandantes, Sonia Noemí, Luis Javier, Sandra Enid, todos de apellidos Colón Rodríguez, la suma de $1,000.00.*

*4. Se modifica la partida de honorarios de abogado a la suma de $3,000.00"*

**IV**

Por lo antes expresado, se dicta sentencia modificando la emitida por el Foro de Instancia y así modificada se confirma en todos sus otros extremos.

Lo acordó y ordena el Tribunal y lo certifica la señora Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

**ESCOLIOS 2001 DTA 134**

1. El 27 de octubre de 2000, emitimos resolución consolidando los recursos KLAN-2000-01030 y KLAN-2000-01034.

2. No puede fundamentarse esta inferencia en la opinión de un médico generalista presentado como perito de los demandantes cuyas cualificaciones son pobres para opinar en este caso y nunca ha hecho una operación de histerectomía vaginal o de taquelectomía vaginal. Además, hay en autos una opinión contraria de una especialista obstetra-ginecólogo. *Zambrana v. Hospital Santo Asilo de Aguas,* 109 D.P.R. 517 (1980).