Rubén Santiago Otero y otros, demandantes y apelados, *v.* Dra. Eileen C. Méndez y otros, demandados y apelantes.

*Números:* AC-89-802
RE-89-642

*Resueltos:* 25 de marzo de 1994

*David Rivé Rivera*, de *Vargas & Rivé*, abogado de la apelante; *Adelaida Vda. De Souffront, Carlos N. Souffront*, de *Souffront & Souffront*, y *Edwin Santiago Rivera*, abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El 12 de septiembre de 1977, el joven de veinticuatro (24) años de edad Rubén Santiago Otero sufrió un accidente automovilístico mientras conducía su motocicleta. Como consecuencia de ello, recibió una contusión en la región púbica, la cual le produjo intenso dolor y dificultad al orinar. A causa de estas molestias, fue referido por la Administración de Compensaciones por Accidentes de Automóviles (A.C.A.A.), para tratamiento, a la uróloga Eileen C. Méndez.

Como parte del tratamiento médico, el 22 de septiembre de 1977 la doctora Méndez hospitalizó a Santiago Otero en el Hospital Presbiteriano, sometiéndolo a pruebas médicas, las cuales culminaron en un diagnóstico de "contusión vesical".[1] Luego de ser tratado con medicamentos y haberle sido dilatada la uretra, éste fue dado de alta el 25 de septiembre de ese mismo año. Debido a que el paciente continuó con dolores al orinar, la doctora Méndez *volvió a internarlo* en el Hospital Presbiteriano el 30 de noviembre de 1977, diagnosticándosele una "contusión vesical con cistitis traumática".[2] *Se le sometió a procedimientos de cistoscopía*[3] *y circuncisión*[4]. Los resultados de la cistoscopía fueron normales, es decir, dieron negativo a cualquier anormalidad orgánica, por lo que al paciente Santiago Otero se le continuó tratando con medicamentos. Fue dado de alta el 4 de diciembre de 1977.

---

[1] Lesión en la vejiga. 4B *Attorney's Textbook of Medicine* Sec. 285 B.11 (1950).

[2] *Cistitis* es la inflamación de la vejiga urinaria; ésta con frecuencia es provocada por una infección. La crisis más aguda puede cursar con hematuria, que se acompaña de dolor en forma de calambre en la región inferior del abdomen que persiste después de haber vaciado la vejiga. *Diccionario Médico Teide*, Barcelona, Ed. Teide, 1988.

[3] Visualización directa de la vía urinaria mediante un cistoscopio insertado en la uretra. Se distiende la vejiga con aire o líquido y se realiza la exploración bajo sedación o anestesia, con el paciente en ayunas y en posición de litotomía. También se emplea para obtener biopsias de tumores u otras lesiones y para extirpar pólipos. *Enciclopedia de medicina y enfermería Mosby*, Barcelona, Ed. Océano, 1992.

[4] *Circuncisión* es la extirpación quirúrgica del prepusio del pene. *Diccionario Médico Teide*, ante.

Esta intervención quirúrgica fue hecha a petición de Santiago Otero, por estar padeciendo de inflamaciones crónicas.

El 19 de enero de 1978, *por continuar quejándose de dolores supra púbicos, molestias al orinar y al eyacular*, Santiago Otero fue *ingresado* por la doctora Méndez en el Hospital San Jorge. Allí se le sometió a una *segunda cistoscopía*, la cual reveló, junto al análisis clínico correspondiente hecho por la doctora Méndez, *que el joven sufría de una obstrucción en el cuello de la vejiga, condición médica conocida como "hipertrofia del cuello de la vejiga"*.[5] A consecuencia de esto, Santiago Otero *fue sometido* por la doctora Méndez, el 20 de enero de ese mismo año, a una *intervención quirúrgica* conocida como *"resección transuretral del cuello de la vejiga"*, operación conocida médicamente como TUR.[6]

En dicha intervención quirúrgica, *la doctora Méndez confirmó su diagnóstico de que el cuello de la vejiga estaba obstruido por una hipertrofia y por una elevación marcada en la parte posterior.* Esta operación también reveló que el paciente Santiago Otero padecía de una infección persistente en la vejiga, además de encontrarse un alto índice de orina residual en la misma. T.E., pág. 309. Éste fue dado de alta el 25 de enero de 1978.

La doctora Méndez envió tejido removido del área púbica del paciente al patólogo doctor De Jesús. Éste señaló que las pruebas efectuadas indicaban que Santiago Otero *padecía de una hipertrofia en el cuello de la vejiga, confirmando con ello el diagnóstico preoperatorio efectuado por la doctora Méndez.*

El 13 de noviembre de 1978 Santiago Otero comenzó a

[5] Se entiende por hipertrofia del cuello de la vejiga como el aumento en el número de células en el cuello de la misma, causando un aumento en el tamaño del mismo y como resultado de ésto obstruyendo la salida de la orina. *Ocurre por lo general en hombres mayores de edad*; la causa es desconocida, aunque se especula que puede ser por desbalances hormonales que ocurren al envejecer la persona. Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, Ed. Butterworth, 1961, Vol. V, pág. 55.

[6] Resección transuretral o resección de la próstata es una intervención que se efectúa cuando la glándula prostática se ha hipertrofiado; consiste en la extirpación de la glándula o parte de ella a través de la uretra utilizando un instrumento denominado "resectoscopio". *Diccionario Médico Teide*, ante.

visitar a otro urólogo, el doctor Dubocq; a éste se le quejó de: impotencia, incapacidad de eyacular y dificultad al orinar. El doctor Dubocq le recomendó hacerse las pruebas médicas de Pielograma Intravenoso (I.V.P.)[7] y Cystograma[8]. *Las mismas arrojaron resultados negativos*; es decir, *no se encontró evidencia orgánica para su alegada falta de eyaculación,* por lo que el doctor Dubocq le recomendó continuar el tratamiento médico con la doctora Méndez.

El 2 de enero de 1979, el señor Santiago Otero y la Srta. María de Lourdes Quiles[9] presentaron demanda por daños y perjuicios, al amparo de lo dispuesto por el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, contra la doctora Méndez y su compañía aseguradora.[10] Alegaron que la doctora Méndez fue negligente al someter a Santiago Otero a una intervención quirúrgica, la cual estaba contraindicada en la persona de éste y al no advertirle de los graves riesgos, consecuencias y complicaciones que dicha intervención quirúrgica podía ocasionarle. Alegaron, además, que a consecuencia de dicha operación, Santiago Otero había quedado estéril e impotente, ocasionándole ello graves sufrimientos y angustias mentales.

En la vista en su fondo del caso, el demandante presentó, en adición a su testimonio, el de sus padres, Don Biviano Santiago y Doña Iris Otero, así como el de los peritos médicos: los urólogos Dr. Ralph E. Duncan y Dr. Francis Dubocq, y el psiquiatra, Dr. Oscar A. Ruiz. Por su parte,

---

[7] Radiograma de la pelvis renal, el medio de contraste se inyecta por vía intravenosa, la que pasa rápidamente a la orina. Véase *Diccionario terminológico de Ciencias* Médicas, 8va ed., Barcelona, Ed. Salvat, 1963.

[8] Registro gráfico en una serie de placas radiológicas obtenidas en el curso de una urografía excretora, una pielografía retrógrada o una cistoscopía retrógrada. *Enciclopedia de medicina y enfermería Mosby,* ante.

[9] A la fecha de la radicación de la demanda, los demandantes eran novios y se proponían contraer matrimonio. *Posteriormente la señorita Quiles retiró su demanda por falta de interés.*

[10] Para la fecha de la radicación de la demanda, el demandante, por desconocer el nombre de la compañía de seguros, la identificó como "John Doe Insurance Company".

la doctora Méndez testificó a su favor y presentó como perito médico al urólogo Dr. Berdardino González Flores.

Luego de finalizar la vista en su fondo, y en vista de lo conflictivo de la prueba pericial presentada por las partes, el magistrado le expresó a éstas que no podía llegar a la *"máxima certeza posible"* en cuanto a si el demandante padecía o no, en esos momentos, de la condición conocida como eyaculación retrógrada[11] y/o de impotencia. *Debido a ello, las partes acordaron someter al demandante a pruebas médicas objetivas que determinasen si éste padecía o no de la referida condición, razón por la cual lo refirieron al urólogo, Dr. Francisco J. Capó.* El doctor Capó, *perito del tribunal*, rindió un informe el 23 de noviembre de 1988 en el que concluyó *que no era posible demostrar objetivamente la presencia de eyaculación retrógrada en el paciente ya que su condición mental, a causa de depresión y el uso de tranquilizantes en dosis altas, hacía imposible la masturbación, factor indispensable para los estudios correspondientes.* T.E., págs. 31–33.[12]

El 30 de diciembre de 1988 el tribunal de instancia dictó sentencia declarando *con lugar* la demanda radicada por la parte demandante, condenando a la Dra. Eileen Méndez y a la Corporación Insular de Seguros, Inc., a pagar solidariamente a Santiago Otero la suma de ciento cincuenta mil dólares ($150,000) por los daños y perjuicios sufridos; siete mil dólares ($7,000) por concepto de honorarios de abo-

---

[11] *Eyaculación retrógrada* es la condición por la cual, al momento de un hombre tener *coitus*, en vez de eliminar el semen hacia el exterior lo envía hacia la vejiga. T.E., pág. 203.

[12] El demandante Santiago Otero fue examinado por el doctor Capó los días 4 de octubre y 2 de noviembre de 1988. En la primera visita el demandante se encontraba bajo los efectos de tranquilizantes, por lo que el doctor Capó se comunicó con el psiquitra de éste, doctor Jiménez Velázquez, para considerar la posibilidad de retirar o disminuir los medicamentos temporalmente mientras se llevaban a cabo los análisis. *El doctor Jiménez le expresó que atribuía la impotencia y falta de líbido del demandante Santiago Otero a su marcada depresión.* En la siguiente visita el demandante Santiago Otero, a pesar de haber suspendido sus medicamentos por una semana, lucía omnibulado y en estado de depresión. En esta segunda visita no le fue posible la masturbación, no pudiendo así someterse a los exámenes correspondientes.

gado, más las costas y gastos correspondientes al pleito; ello como consecuencia de haber determinado que la operación a la que fue sometido el demandante era una innecesaria ya que éste no padecía de condición alguna que justificara la misma y que la doctora Méndez no obtuvo del demandante un "consentimiento informado" para efectuar dicha intervención quirúrgica.

El 24 de enero de 1989 la doctora Méndez, mediante moción de reconsideración, solicitó la nulidad de la sentencia dictada por razón de que la parte demandada jamás tuvo acceso al informe del perito del tribunal, doctor Capó, previo a que se dictara la sentencia. Señaló, además, que la evidencia médica presentada en la vista no demostraba la existencia de una lesión en la persona del demandante. El 28 de febrero de 1989 el tribunal de instancia declaró sin lugar estas peticiones toda vez que "el informe del Dr. Capó no favorece a ninguna de las partes" (Caso Núm. RE-89-642, Parte I, Solicitud de revisión, pág. 7) y por lo tanto "el tribunal no lo utilizó como elemento de juicio". Íd.

En el interín, el 16 de febrero de 1989 la Corporación Insular de Seguros, Inc. presentó moción de reconsideración, en la que señaló que jamás había sido demandada, ni emplazada, en el pleito por lo que el tribunal carecía de jurisdicción para dictar sentencia en su contra. El 28 de febrero de 1989, el tribunal de instancia emitió una sentencia enmendada, acogiendo la solicitud de la Corporación Insular de Seguros, Inc.; en consecuencia, la eliminó del pleito como parte demandada.

La parte demandante solicitó, entonces, reconsideración de la sentencia enmendada por entender que la Corporación Insular de Seguros, Inc. se había sometido voluntariamente a la jurisdicción del tribunal. Estando sometida esta moción de reconsideración ante el tribunal a quo, la doctora Méndez presentó solicitud de revisión (Caso Núm. RE-89-197) ante este Tribunal. Declaramos sin lugar dicho recurso por haber sido radicado prematuramente el mismo.

El 25 de octubre de 1989, el tribunal de instancia dictó una *segunda* sentencia enmendada. En ésta "incluyó" nuevamente a la Corporación Insular de Seguros, Inc. como demandada, limitando su responsabilidad a los límites de la póliza, cien mil dólares ($100,000).

De estos dictámenes acudió ante este Tribunal la Dra. Eileen Méndez mediante recurso de revisión (Caso Núm. RE-89-642), alegando que el foro de instancia erró:

### A.

... al condenar a la Dra. Eileen Méndez a pagarle ciento cincuenta mil dólares ($150,000.00) en daños por angustias físicas y mentales al demandante a pesar de que la prueba de sus propios médicos estableció la ausencia de la condición orgánica que alegadamente produjo los daños emocionales por los que reclama.

### B.

... al concluir que la operación que le realizó la Dra. Eileen Méndez al demandante era improcedente ante el cuadro clínico que presentaba el demandante.

### C.

La sentencia debe ser dejada sin efecto al no habérsele dado oportunidad a la demandada a examinar el perito nombrado por el tribunal.

### D.

... al determinar que la Dra. Eileen Méndez fue temeraria al defenderse en este caso.

### E.

De confirmarse que el demandante padece de la condición que alega y que la misma se la causó la operación que le practicó la Dra. Méndez, se plantearía entonces si la cantidad concedida en daños debe modificarse. Caso Núm. RE-89-642, Parte I, Solicitud de revisión, págs. 7–8.

La Corporación Insular de Seguros, Inc., por su parte,

presentó recurso de apelación (Caso Núm. AC-89-802) ante este Foro. En el mismo alegó que:

> La sentencia apelada —al dictarse contra una entidad que no era parte en el pleito— contradice las garantías del debido proceso de ley y por lo tanto es nula.

Por tener ambos recursos el mismo trasfondo fáctico, ordenamos su *consolidación* y expedimos los mismos. En aras de estar en mejor posición para evaluar los señalamientos de error, *ordenamos la transcripción de la evidencia que desfiló ante el foro de instancia.* Estando en condiciones de resolver los recursos radicados, procedemos a así hacerlo.

*Procede revocar*, ello por *dos* (2) razones. Somos del criterio, *en primer lugar*, que el tratamiento médico que le brindara la doctor Méndez a su paciente, el demandante Rubén Santiago Otero, cumplió con la norma vigente en nuestra jurisdicción, relativa a la determinación de responsabilidad en esta clase de casos, a los efectos de que los médicos vienen en la obligación de ofrecer a sus pacientes aquella atención médica que, a la luz de los modernos medios de comunicación y enseñanza, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *Pérez Torres v. Bladuell Ramos,* 120 D.P.R. 295 (1988); *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark,* 119 D.P.R. 816 (1987); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983); *Oliveros v. Abréu,* 101 D.P.R. 209 (1973).

*En segundo término,* un análisis desapasionado y objetivo de la transcripción de evidencia nos lleva a la conclusión que la determinación del tribunal de instancia —a los efectos de que el demandante, como consecuencia de la intervención quirúrgica a que fue sometido por la doctora demandada, sufre de una condición de eyaculación retrógrada y de impotencia— *no* constituye el balance más racional, justiciero y jurídico de la totalidad de la prueba pre-

sentada en el caso. *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980). *Veamos.*

## I

■ A. Conforme a la norma mínima de atención médica vigente en nuestra jurisdicción, se espera que el médico ofrezca a su paciente aquella atención médica, cuidados, destrezas y protección que, *a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de las ciencias médicas*, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 384 (1988); *Ríos Ruiz v. Mark*, ante; *Oliveros v. Abréu*, ante; H.M. Brau, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, pág. 248.

■ En los casos de alegada impericia médica, la parte demandante viene en la obligación de establecer, mediante preponderancia de la prueba, que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 650 (1988); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 744 (1983); *Zambrana v. Hospital Santo Asilo de Damas*, ante, pág. 521. En otras palabras, la parte demandante tiene que probar que el tratamiento suministrado por el demandado no fue el adecuado, *Rosado Rosado v. E.L.A.*, 108 D.P.R. 789, 792 (1979); para ello se requiere que la relación de causalidad entre el daño y el acto negligente *no* se establezca a base de una mera especulación o conjetura. *Ramos, Escobales v. García, González*, ante.

■ Al médico se le reconoce una amplia discreción profesional en su trabajo; éste no es responsable por mala

práctica profesional cuando se enfrenta a una situación en la cual cabe la duda educada y razonable sobre cuál es el curso médico a seguir. *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 732 (1983); *Oliveros v. Abréu*, ante, pág. 228. Ante la imputación de negligencia médica en el diagnóstico, será admisible la defensa *de error de juicio* si éste se produce después de que el médico haya efectuado esfuerzos concienzudos para enterarse y cerciorarse de los síntomas y de la condición del paciente, agotando los medios de diagnóstico que el estado de conocimiento pone a disposición de la profesión médica, y cuando las autoridades médicas reconocidas están divididas en cuanto a cuál debe ser el procedimiento de diagnóstico a seguirse. *Oliveros v. Abréu*, ante, pág. 227; Brau, ante, pág. 248.

Por otro lado, ante una alegación de impericia médica en el tratamiento, procederá la defensa de *error de juicio* cuando existan discrepancias entre las autoridades médicas en cuanto al procedimiento terapéutico indicado en casos como el del paciente. *Oliveros v. Abréu*, ante, pág. 228; Brau, ante, pág. 258. En *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985), resolvimos que bajo las circunstancias de un buen juicio profesional, enmarcado dentro de los linderos de lo razonable y aceptado por amplios sectores de la profesión médica, aun aceptando que el diagnóstico o tratamiento brindado fue erróneo, la existencia de criterios divergentes constituye defensa válida, eximente de responsabilidad, debido a la amplia discreción profesional que se le reconoce al médico. Véase, además, *Ramos, Escobales v. García, González*, ante. El hecho de que el efecto que puede tener un tratamiento médico no pueda garantizarse, no exime de la obligación de prestarlo si la mejor práctica de la medicina así lo requiere. El error de juicio en el tratamiento o en el diagnóstico debe ser razonable. *Cruz v. Centro Médico de P.R.*, ante, pág. 732.

Conforme a lo expresado examinamos, *en primer lugar*, si la doctora Méndez fue negligente al *diagnosticar* que

Santiago Otero padecía de hipertrofia en el cuello de la vejiga; ello ante la alegación de la representación legal del demandante Santiago Otero que sostiene,. en síntesis, que el diagnóstico médico efectuado por la doctora Méndez no estaba apoyado en los exámenes médicos. Aduce, además, que en los casos de pacientes jóvenes, como el de Santiago Otero, no se espera que éstos desarrollen una hipertrofia en el cuello de la vejiga.

Un examen de la totalidad de la prueba presentada en la vista nos lleva a concluir que el tribunal de instancia erró en su apreciación de la prueba en este aspecto. De los testimonios periciales se desprende que la hipertrofia del cuello de la vejiga es una obstrucción en la salida urinaria de la vejiga a causa de un ensanchamiento de los músculos de la misma. Muchas veces esta condición se confunde con una contractura del cuello de la vejiga, la cual es también una obstrucción, pero ésta es a causa de una banda fibrosa de tejido que se forma en la salida de la vejiga haciendo más estrecho el pasaje urinario. Véase Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, Ed. Butterworth, Sup. 1961, Vol. V, pág. 553. La hipertrofia del cuello se da, por lo general en hombres mayóres de edad. Íd., pág. 550. Esta condición produce retención urinaria, dificultad y dolor al orinar; si la obstrucción no es elimi-nada, los riñones pueden verse afectados.[13] Como sínto-mas de esta condición están: la frecuencia y urgencia al orinar; decrecimiento en la cantidad y fuerza al orinar; ur-gencia y deseos de orinar frecuentemente, y dolor en la parte baja del abdomen, acompañado el mismo de un au-mento en la orina residual. Estos síntomas pueden venir acompañados de una infección.[14]

Los peritos médicos coinciden que el diagnóstico médico, en este tipo de condición, se tiene que basar *en las quejas* expresadas al médico por el paciente y *en el resultado de*

---

[13] Véase Cantor, ante, pág. 554.
[14] Véanse: Cantor, ante, pág. 552; Morton, ante, pág. 236.

*una cistoscopía*, ya que esta prueba es la única forma de observar la obstrucción.(¹⁵) En el caso ante nos, el demandante Santiago Otero se quejaba continuamente de dolor en el área pélvica y dificultad al orinar. Inclusive, en diciembre de 1978, se quejó de tener problemas al eyacular. La doctora Méndez declaró que, durante varios meses, ella trató con medicamentos y procedimientos de dilatación y que, a pesar de ésto, *él continuaba visitándola diariamente, quejándose de dificultad al orinar.* La doctora Méndez hizo unos análisis médicos conducentes a examinar la orina residual y encontró que Santiago Otero tenía 50cc. T.E., pág. 278. Ante esta situación, ella efectuó *una segunda cistoscopía, la cual reveló una obstrucción en el cuello de la vejiga,* diagnóstico que fue *confirmado posteriormente por los análisis postoperatorios del tejido removido de la vejiga efectuados por el patólogo doctor De Jesús.*(¹⁶)

A la luz de la prueba ofrecida, no encontramos evidencia alguna que nos lleve a concluir que el diagnóstico médico realizado por la doctora Méndez fue uno errado, como concluyó el foro de instancia. *El mencionado diagnóstico es uno razonable y se produjo el mismo después que el facultativo médico llevara a cabo los exámenes médicos disponibles a la luz de los modernos medios de conocimiento de la profesión médica.* Véanse: *Oliveros v. Abréu*, ante; Brau, ante, pág. 248. La diferencia en los testimonios periciales, basada en que las autoridades médicas están divididas en cuanto al diagnóstico correspondiente, a lo más que nos podría llevar a concluir es que hubo un *error de juicio* en el diagnóstico, eximente de responsabilidad profesional. *Oliveros v. Abréu*, ante, pág. 227.

---

(¹⁵) Para diagnosticar una hipertrofia del cuello de la vejiga hay que examinar el historial médico, hacer un examen físico, estudios de laboratorio y radiológico, y una cistoscopía en la cual se pueda observar la próstata, la uretra y la vejiga. Cantor, ante, pág. 553; *Attorney's Textbook of Medicine*, ante.

(¹⁶) Uno de los peritos de la parte demandante, doctor Dubocq, señaló que no estaba fuera de lo concebible que el demandante tuviese una hipertrofia, aunque alegó que lo encontrado en la segunda cistoscopía pudiese haber sido producto de una inflamación o una infección en la vejiga.

B.   La parte demandada alega, además, que el tribunal de instancia erró al concluir que el *tratamiento* brindado al demandante Santiago Otero por la doctora Méndez fue uno médicamente negligente. La alegación de la parte demandante se basa en que el tratamiento efectuado por la doctora Méndez, consistente en la intervención quirúrgica (TUR), no se debió efectuar en Santiago Otero por estar la misma contraindicada en una persona de veinticuatro (24) años.

La prueba ofrecida sobre este particular consistió en el testimonio del doctor Duncan,([17]) el cual testificó que esta operación nunca se hace en pacientes jóvenes por las graves consecuencias de impotencia y eyaculación retrógrada, T.E., pág. 113; señaló que hay otros tratamientos menos drásticos como lo son la dilatación de la vejiga y el uso de medicamentos para aliviar la condición de obstrucción en el cuello de la misma. T.E., pág. 113. Por su parte, el doctor Dubocq([18]) señaló que esta operación, como última alternativa, se efectúa en pacientes que tienen problemas al orinar y que efectivamente tienen una obstrucción del cuello de la vejiga. T.E., pág. 230. Señaló que antes de hacer esta intervención se debe tratar al paciente con medicamentos por un período prolongado de tiempo para tratar de evitar someterlo a esta operación. T.E., págs. 209–210.

El perito médico de la parte demandada, Dr. Bernardino González Flores —facultativo médico que posee un impresionante historial profesional—([19]) testificó que dicha operación (TUR) estaba reconocida en 1978, fecha en que se

---

([17]) Hizo sus estudios en medicina en el Colegio Médico de Virginia; su especialidad en urología en la Universidad de Cincinnati. Ha publicado artículos de urología pediátrica, cáncer de la vejiga, reacciones de la vejiga ante tratamientos de radiación, entre otros.

([18]) Hizo sus estudios de medicina con especialidad en Urología en la Universidad de Puerto Rico.

([19]) Hizo sus estudios de medicina en la Universidad de Temple, Filadelfia. Fue Director del Departamento de Urología del Hospital Oncológico González Martínez. Es profesor retirado de la Universidad de Puerto Rico y Universidad de Medicina de Cayey y fue, además, Director Médico del Departamento de Urología de la Universidad de Puerto Rico.

efectuó la intervención quirúrgica, en el campo de la urología como una operación adecuada para la hipertrofia del cuello de la vejiga. T.E., pág. 304. Señaló que los factores a tomar en consideración al efectuar esta intervención quirúrgica son: que existe una obstrucción en el cuello de la vejiga, que existe orina residual y que el paciente siente dolor al orinar o no puede orinar. T.E., pág. 307. Señaló que en el caso del demandante Santiago Otero, los récord médicos demuestran que la segunda cistoscopía reveló que el paciente efectivamente tenía una obstrucción y se encontró en su vejiga orina residual. T.E., pág. 309.

La parte demandada descansó, en parte, en el texto de urología del profesor Campbell,[20] el cual afirma que en una condición de contractura del cuello de la vejiga:[21]

> Today *trasurethral resection of the vesical outlet* is my usual first choice of procedure and is widely employed by those tecnically equipped to perform it. (Énfasis en el original.) M.F. Campbell y J. Hartwell, *Urology*, 3ra ed., Filadelfia, Ed. Saunders Co., 1970, Vol. II, pág. 1557.

La parte demandante alegó que la cita antes transcrita del texto de Campbell se refería únicamente a la condición de contractura del cuello de la vejiga *congénita*. El doctor Duncan expresó que en caso de que Campbell entendiera que era para toda condición de obstrucción, entonces éste estaba errado, ya que esta operación no se debe hacer en pacientes jóvenes. T.E., pág. 132. Sobre este particular, *las opiniones periciales están divididas*; el Dr. Bernardino González, perito de la parte demandada, sostiene que el texto de Campbell considera la intervención quirúrgica

---

(20) M.F. Campbell y J. Hartwell, *Urology*, 3ra ed., Filadelfia, Ed. Saunders Co., 1970, Vol. II. Surge de la prueba pericial de ambas partes que la tercera edición de este texto estaba vigente a la fecha de la operación, a saber, en enero de 1978. La cuarta edición fue publicada en julio de 1978. Este texto es reconocido como una autoridad en la profesión médica de Estados Unidos.

(21) Como señaláramos anteriormente, una hipertrofia, al igual que una contractura en el cuello de la vejiga, son obstrucciones urinarias, aunque las mismas son producidas por diferentes razones.

(TUR) para *cualquier* tipo de obstrucción del cuello de la vejiga, T.E., pág. 306, aunque admite que en el texto se está hablando tan sólo de una condición congénita. El doctor González testificó haber hecho la operación en jóvenes de veinticuatro (24) años y en niños. T.E., pág. 312.

Ante esta prueba conflictiva, nuestra función consiste en determinar si la intervención quirúrgica (TUR) efectuada por la doctora Méndez es una reconocida a la luz de los modernos medios de comunicación y enseñanza generalmente reconocidas por la profesión médica. *Oliveros v. Abréu*, ante.

Ante un diagnóstico de hipertrofia en el cuello de la vejiga, los tratamientos médicos usualmente sugeridos son de intervención quirúrgica. Las más conocidas son: (1) Suprapubic protacting; (2) Perineal prostactectory; (3) *Resección Transuretral del Cuello de la Vejiga*; (4) Retropubic protatectomy. Cantor, ante, pág. 554; A.S. Snyder, *Medical Library*, Nueva York, Ed. Lawyer Co. Pub., 1991, Vol. I, pág. 223. La selección del método quirúrgico depende de la condición general del paciente y del tamaño de la obstrucción. Cantor, ante, pág. 554.

El TUR se efectúa para remover el tejido prostático que obstruye el pasaje urinario para así aumentar el flujo urinario del paciente. Morton, ante, pág. 236. Entre sus ventajas se encuentra que requiere poco tiempo de hospitalización y no hay incisión externa; entre sus desventajas se encuentra que puede causar estrechez en la uretra, incontinencia postoperatoria y hemorragias. Ocasionalmente puede causar, como en toda clase de estas operaciones, pérdida de control urinario y disminución en la potencia sexual. Cantor, ante, págs. 555–556. *El TUR es la operación más común para remover la obstrucciones en las glándulas prostáticas.* Snyder, ante; Cantor, ante, pág. 556.[22]

---

[22] Para jurisprudencia en que se ha realizado un TUR, para padecimientos relacionados con la vejiga y próstata, véanse: *Livings v. Lanasa*, ante; *Roussel v. Sharp*, ante; *Smith v. South Share Hosp.*, 543 N.E.2d 868 (1989); *Chiero v. Chicago*

Aunque estamos claramente ante una situación en que existen discrepancias de opiniones entre autoridades médicas sobre la procedencia y conveniencia de que en el caso ante nuestra consideración se sometiera al demandante a dicha operación, son *hechos innegables* que Santiago Otero padeció durante varios meses de dolor y dificultad al orinar; que durante este tiempo fue tratado con antibióticos y dilatación de la uretra; que a pesar de ello sus dificultades urinarias continuaban persistentemente; al demandante se le encontró una obstrucción en el cuello de la vejiga, además de una infección; y que los medicamentos y la dilatación no aliviaron la condición del paciente.

Si consideramos el número de veces que el demandante visitó a la doctora Méndez quejándose de dolor y dificultad al orinar, el examen de la cistoscopía que reveló una obstrucción en el cuello de la vejiga y la prueba que demostró un alto índice de orina residual, somos del criterio que resulta forzosa la conclusión de que la operación efectuada en el demandante estaba médicamente indicada. De la prueba presentada en el juicio, surge claramente que la doctora Méndez usó todos los métodos no quirúrgicos para aliviar los padecimientos del demandante *antes* de someterlo a un TUR. *A lo sumo*, nos enfrentamos nuevamente ante el *error de juicio informado*, el cual *no* es fuente de responsabilidad. *Oliveros v. Abréu*, ante.

II

No obstante lo antes expresado, *y concluido*, nos vemos en la obligación de determinar, *y resolver*, si en el presente caso la prueba presentada por la parte demandante estableció que Santiago Otero en efecto sufrió una lesión o "daño". Ello en vista del hecho de que —independientemente de que el diagnóstico que hiciera, y el trata-

---

*Osteopathic Hospital*, 392 N.E.2d 203 (1979); *Mitz v. Stern*, 183 N.W.2d 608 (1970); *Cleveland v. Wong*, ante; *Beatly v. Morgan*, ante; *Buie v. Reynolds*, ante.

miento que brindara, la doctora Méndez en el presente caso al demandante fuera uno médicamente correcto— el tribunal sentenciador determinó que la referida demandada no obtuvo del demandante un "consentimiento informado" para efectuar la intervención quirúrgica a la cual lo sometió. Dicho de otra forma, si en efecto no hubiera habido un "consentimiento informado" de parte del demandante Santiago Otero, y éste efectivamente hubiera recibido un "daño" como consecuencia de la operación efectuada, la doctora Méndez sería responsable civilmente del mismo independientemente del hecho de que su diagnóstico, y la operación efectuada, hubieran sido correctos e indicados. Ello así ya que el hecho de que el médico no obtenga un "consentimiento informado" del paciente para intervenirlo quirúrjicamente constituye una causa de acción al amparo del Art. 1802 del Código Civil, ante, independiente y distinta de una causa por negligencia médica en el diagnóstico o tratamiento.[23] Véase K. Norrie, *Medical Malpractice: The Scope of Informed Consent in Negligence*, 32 Int'l S. Comp. L.Q. 229 (1983). La doctrina del consentimiento informado[24] fue recientemente discutida por este Tribunal en *Rodríguez Crespo v. Hernández*, ante, pág. 664, donde expresamos que ésta

> ... impone al médico el deber de informar a su paciente acerca de la naturaleza y riesgos de un tratamiento médico propuesto, de manera que el paciente se encuentre en la posición de hacer una decisión inteligente e informada. (Citas omitidas.)

---

[23] Cabe señalar que este Tribunal ha expresado que el médico, al practicar una intervención quirúrgica en una persona sin su consentimiento, no incurre en el delito de acometimiento y agresión, por carecer esta acción del elemento esencial de la intención; constituyendo una acción de negligencia al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Rojas v. Maldonado*, 68 D.P.R. 818 (1948).

[24] La doctrina de consentimiento informado se basa en el derecho fundamental que consagra la inviolabilidad del cuerpo humano como un derecho inalienable de las personas. Véanse: *Pueblo v. Najur Bez*, 111 D.P.R. 417, 422 (1981); *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Torres v. Hospital Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); H.M. Brau y R.A. Marcial Rojas, *La doctrina del consentimiento ilustrado para tratamiento médico*, 54 Rev. Jur. U.P.R. 113 (1985).

■ Claro está, de no establecerse por la parte demandante en un caso de impericia médica como el de autos, por preponderancia de la prueba, *la existencia de un "daño"*, poco importaría que el cirujano no hubiera obtenido de su paciente el "consentimiento *informado*" que se requiere en esta clase de situaciones.([25]) *Rodríguez Crespo v. Hernández*, ante, págs. 665–666. Acometemos, en consecuencia, la encomienda de determinar si en el presente caso la prueba que presentara el demandante Santiago Otero en efecto estableció que él sufrió un daño como consecuencia de la operación a la que fue sometido por la doctora Méndez.([26])

Al examinar la prueba presentada a nivel de instancia, debemos tener presente que este Tribunal ha expresado que, al cumplir con nuestra función revisora en casos de impericia médica, *la decisión que hagamos debe ser una fundada en la prueba vertida en el juicio por los peritos y en la prueba documental.* En ausencia de prueba, no es función de este Tribunal establecer, a nivel apelativo, los elementos requeridos por el Art. 1802 del Código Civil, ante; esto es, no debemos ceder a la tentación de sustituir el criterio de los peritos médicos por el nuestro, a base de

([25]) Ello así, *naturalmente*, siempre y cuando el médico hubiera obtenido originalmente de su paciente el "consentimiento general" de éste para llevar a cabo la intervención quirúrgica. De no haber el médico obtenido dicho consentimiento general, el paciente tendría una causa de acción bajo el Art. 1802 del Código Civil, ante, contra el médico.

Los elementos esenciales en una reclamación por daños y perjuicios basados en una alegación de impericia médica por no obtener el médico un consentimiento informado, antes de efectuar una operación o tratamiento, son: (1) determinar si el médico tenía el deber de divulgar determinada información; (2) determinar la información específica que debe ser divulgada, y (3) determinar *si la causa próxima del daño alegado* fue la falta de divulgación de los riesgos envueltos en dicha operación o tratamiento. G.F. Tietz, *Informed Consent in the Prescription Drug Context: The Special Case*, 61 Wash. L. Rev. 367, 371 (1986).

([26]) Sabido es que una acción judicial para exigir resarcimiento por los daños ocasionados por un acto de impericia médica equivale a un caso ordinario de daños y perjuicios por negligencia. Todo lo que se requiere es que la parte demandante establezca *por preponderancia de prueba*: (1) la existencia de una lesión o padecimiento (daño); (2) que el profesional no actuó de acuerdo a las normas mínimas de cuidado exigidas a la profesión médica (negligencia), y (3) la relación causal entre la actuación u omisión del médico y el daño. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 385 (1988).

un estudio a nivel apelativo de la literatura disponible. *Rodríguez Crespo v. Hernández*, ante, pág. 649; *Ríos Ruiz v. Mark*, ante.

La determinación del tribunal de instancia, a los efectos de que el demandante Santiago Otero padece los efectos de la condición conocida como eyaculación retrógrada y/o de impotencia, descansa, *de manera exclusiva*, en el testimonio del demandante; ello así ya que los testimonios de los peritos urólogos por él presentados, esto es, el doctor Dubocq y el doctor Duncan, realmente *no* sostienen dicha determinación. Veamos.

Como parte de su testimonio, el doctor Dubocq señaló que Santiago Otero se había quejado de padecer de dificultades urinarias, al igual que "cuando iba a tener relaciones sexuales notaba que no eyaculaba". T.E., pág. 202. Señaló, además, que éste le había expresado que dicha situación le producía "temor a llevar a cabo sus relaciones sexuales debido a que esto le producía cierto grado de impotencia en el sentido de que le daba miedo el no poder eyacular". Íd. El doctor Dubocq señaló que una de las complicaciones de la operación efectuada por la doctora Méndez —resección transuretral del cuello de la vejiga— es la eyaculación retrógrada, *la cual produce un problema de esterilidad y no de impotencia*. Íd., pág. 203.[27] Añadió que aproximadamente un 50% de los pacientes que se someten a esta operación desarrollan eyaculación retrógrada. Íd., pág. 231. A preguntas del abogado de la parte demandada, *el doctor Dubocq admitió que le era muy difícil comprobar si el problema del demandante Santiago Otero era uno real o imaginario; habiendo este perito admitido en corte abierta el haber expresado, con anterioridad al juicio, que no encontraba daño orgánico alguno en el demandante.*[28] Admitió,

---

[27] Reconocemos, sin embargo, que éste no descartó que "si el paciente desarrolla ciertos problemas a consecuencias de que eyacula retrógrado ... podía producir posiblemente cierto grado de impotencia". T.E., pág. 203.

[28] Con anterioridad a la vista, el 18 de enero de 1980 y en contestación a una carta del Lcdo. Noel Colón Martínez, el doctor Dubocq había expresado: "*no encon-*

además, que estaba de acuerdo con la apreciación médica de su compañero de oficina, doctor Acevedo,[29] a los efectos de que *"duda mucho [que] el paciente [tenga] patología orgánica"*; ya que las pruebas médicas a las que fue sometido el demandante *no evidenciaron orgánicamente su falta de eyaculación.*

El otro perito médico de la parte demandante, el doctor Duncan, declaró *que no había hecho ningún examen médico al paciente Santiago Otero para corroborar su alegada condición de impotencia y de eyaculación retrógrada.* T.E., pág. 123. Adujo que sus conclusiones, a los efectos de que Santiago Otero padecía de eyaculación retrógrada, *se sostenían únicamente en los récord médicos.*[30] Declaró que si el paciente se queja de impotencia, ello es el resultado de la operación efectuada por la doctora Méndez. Íd., pág. 118. En cuanto a este punto resulta procedente enfatizar, sin embargo, que el perito de la *parte demandada*, doctor González, declaró que *no* había prueba médica a los efectos de que Santiago Otero padeciese de eyaculación retrógrada, *ya que los récord médicos no demostraban tal condición orgánica.* Íd., pág. 311.

Por su parte, el demandante Santiago Otero testificó que luego de la operación experimentó dolores en el área baja del estómago que le eran constantes y que su vida sexual se afectó completamente; *aunque más tarde aclaró* que los problemas sexuales *surgieron desde el accidente* y que luego se *agravaron* con la operación. T.E., pág. 351. *Alegó que estaba impotente y que luego de la operación no había podido lograr una erección.* Íd., págs. 338–339. Cabe señalar que el demandante, así como los médicos que lo

---

*tramos que el paciente tenga daños orgánicos."* (Énfasis suplido.) T.E., págs. 227–228.

[29] El paciente Santiago Otero fue examinado el 24 de noviembre de 1978 por el doctor Acevedo.

[30] La opinión pericial del doctor Duncan se basó en: los récord médicos de los hospitales en que estuvo recluido el demandante; informe siquiátrico del doctor Ruiz; carta del doctor Nadal; *informes de resultados de rayos X efectuados por el doctor* Landrón Bou; anotaciones en los récord de la oficina del doctor Duncan y doctor Dubocq; y en los récord médicos de la doctora Méndez.

examinaron, declararon que con anterioridad al accidente el demandante Santiago Otero *tenía problemas de infertilidad por deficiencias en sus espermatozoides. Íd., pág. 345.*

Ante estos testimonios, *cuando menos conflictivos*, el tribunal de instancia determinó que el demandante había quedado con esterilidad permanente, eyaculación retrógrada e impotencia total.[31] *Dicha determinación, como hemos podido notar, encuentra apoyo únicamente en el testimonio del propio demandante.*

Tenemos, en resumen, ante nuestra consideración una situación en que ninguno de los peritos médicos que testificaron ante el tribunal de instancia —los peritos de la parte demandante, la parte demandada e, inclusive, un perito del tribunal— pueden asegurar o establecer el hecho de que en efecto el demandante Santiago Otero padece de eyaculación retrógrada y/o impotencia. Tan es así que, terminado el desfile de la prueba pericial de ambas partes, como consecuencia de la "ambivalencia" expresada y demostrada por el juez de instancia sobre si en efecto el demandante sufría o no de dichas condiciones, las partes estipularon someter al demandante a la evaluación de un perito imparcial y objetivo;[32] procedimiento poco usual si se considera que ya había desfilado totalmente la prueba de las partes. Este testigo tampoco pudo arrojar "luz" al respecto; ello debido a las condiciones y circunstancias que explicó en su reporte.

La determinación sobre el daño sufrido por el demandante, si alguno, descansa totalmente en el testimonio que, a esos efectos, brindara el demandante. No hay duda

---

[31] Como indicáramos anteriormente, el juez de instancia había expresado, con anterioridad a este dictamen, que no podía llegar a la "máxima certeza posible" sobre la condición del demandante Santiago Otero.

[32] Naturalmente, las expresiones del juez de instancia a los efectos de que no podía tener la "máxima certeza posible" sobre la condición del demandante constituye una posición errónea y poco afortunada de parte de dicho magistrado. Conforme nuestro ordenamiento, un hecho se prueba, en los casos civiles, por "preponderancia de la prueba". Véanse: Regla 10(F) de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV; *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981).

que constituye norma reiterada, y trillada, que el testimonio de un solo testigo sobre un hecho, que le merezca entero crédito al tribunal, es suficiente para que dicho hecho quede establecido. Regla 10(D) de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV; *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991). No es menos cierto, sin embargo, que el testimonio del demandante Santiago Otero es uno interesado y prejuiciado. Por otro lado, no podemos echar a un lado, e ignorar, el hecho de que, aun frente al testimonio del demandante, el juez de instancia obviamente tuvo duda sobre el mismo; duda y ambivalencia, repetimos, que causó —a solicitud del propio juez de instancia— la estipulación de las partes sobre la designación de un "perito del tribunal". Por último, tenemos el hecho incuestionable que del testimonio ofrecido por los peritos médicos presentados por el propio demandante no se puede concluir que éste en efecto sufre de la condición conocida como eyaculación retrógrada y de impotencia.

Ante este cuadro de hechos, somos del criterio que debemos rechazar la determinación que hiciera el tribunal de instancia sobre la lesión o daño sufrido por el demandante como consecuencia de la intervención quirúrgica a la que fue sometido por la doctora Méndez; ello por razón de que dicha determinación, a nuestro entender, *no* constituye el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada en el caso. *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357 (1982); *Zambrana v. Hospital Santo Asilo de Damas*, ante.

No habiéndose establecido que el demandante Santiago Otero en efecto sufrió un "daño", éste no tiene causa de acción contra la demandada doctora Méndez al amparo de las disposiciones del Art. 1802 del Código Civil de Puerto

Rico, ante. *Rodríguez Crespo v. Hernández*, ante; *Medina Santiago v. Vélez*, ante.[33]

*Se dictará sentencia de conformidad.*

Los Jueces Asociados Señores Negrón García y Fuster Berlingeri disintieron sin opinión escrita.

---

[33] La conclusión a la que llegamos hace innecesaria la consideración sobre si el demandante prestó, o no, un consentimiento informado para la operación de que fue objeto, como tampoco los señalamientos de errores de la Corporación Insular de Seguros.